[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12348

_____

D.C. Docket No. 1:09-cv-00009-KD-B

VERNON MADISON,

Petitioner-Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT
OF CORRECTIONS, ATTONREY GENERAL,
STATE OF ALABAMA, ET AL.,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(August 4, 2014)

Before WILSON, MARTIN and JORDAN, Circuit Judges.

MARTIN, Circuit Judge:

Petitioner Vernon Madison, an Alabama prisoner on death row, appeals

from the District Court's denial of his petition for writ of habeas corpus after a

federal evidentiary hearing.  We granted Mr. Madison a certificate of appealability

on the question of whether the prosecutor in his case engaged in racially

discriminatory jury selection in violation of Batson v. Kentucky, 476 U.S. 79, 106

S. Ct. 1712 (1986), and the Fourteenth Amendment to the U.S. Constitution.  After

careful consideration of the record, and with the benefit of briefing and oral

argument, we affirm the District Court's judgment denying habeas relief.

## I.    BACKGROUND

Mr. Madison, a black man, has been tried three times for killing a white

police officer in Mobile, Alabama.  Madison v. State, 718 So. 2d 90, 94 (Ala.

Crim. App. 1997) (Madison III).[1]  His first conviction and death sentence were set

aside because of a Batson violation.  Madison v. State, 545 So. 2d 94, 99–100 (Ala.

Crim. App. 1987) (Madison I).  At his second trial, he again was convicted and

sentenced to death.  Madison v. State, 620 So. 2d 62, 63 (Ala. Crim. App. 1992)

(Madison II).   His second conviction was reversed this time by the Alabama Court

of Criminal Appeals because the state had elicited expert testimony based partly on

facts not in evidence.  Id. at 72–73.

At his third trial, which is the subject of this habeas appeal, Mr. Madison

was convicted of capital murder and sentenced to death after the trial judge

---

[1]  The facts of Mr. Madison's case are described more fully in the Alabama Court of Criminal
Appeals's decision affirming his conviction and death sentence following his third trial.
Madison III, 718 So. 2d at 94.

2

overrode the jury's 8-4 recommendation that he be sentenced to life in prison without the possibility of parole. Madison III, 718 So. 2d at 94. Mr. Madison's conviction and death sentence were affirmed on direct appeal by the Alabama Court of Criminal Appeals, id. at 104, and by the Alabama Supreme Court. Ex parte Madison, 718 So. 2d 104, 108 (Ala. 1998). The Supreme Court denied Mr. Madison's petition for writ of certiorari. Madison v. Alabama, 525 U.S. 1006, 119 S. Ct. 521 (1998). He filed a petition for state postconviction relief, which was dismissed by the state trial court and affirmed by the Alabama Court of Criminal Appeals. Madison v. State, 999 So. 2d 561 (Ala. Crim. App. 2006) (Madison IV). He then filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the Southern District of Alabama, which was denied.

This is the second time this Court has considered the denial of Mr. Madison's federal habeas petition. The first time, this Court reversed the District Court's denial of Mr. Madison's Batson claim. Madison v. Comm'r, Ala. Dep't of Corr., 677 F.3d 1333, 1339 (11th Cir. 2012) (per curiam) (Madison V).[2] Batson prohibits the use of peremptory challenges to exclude people from the petit jury based on their race, as a violation of the Equal Protection Clause of the Fourteenth Amendment. 476 U.S. at 96–98, 106 S. Ct. at 1723–24. The Supreme Court has

---

[2] In his first appeal to this Court, we affirmed the District Court's denial of Mr. Madison's claims that the Alabama courts refused to consider mitigation evidence and that the jury override was unconstitutional. Madison V, 677 F.3d at 1336; but see id. at 1339–40 (Barkett, J., concurring) (questioning whether Alabama's jury override system can be constitutional).

clearly established a three-step process for deciding whether a <u>Batson</u> violation has

occurred:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

<u>Johnson v. California</u>, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416 (2005) (footnote,

citations, and quotation marks omitted).

Our first opinion summarized the facts relevant to Mr. Madison's <u>Batson</u>

claim as follows:

> In this case, the venire originally consisted of sixty members, fifteen of whom were black.  After strikes for cause, there were thirteen qualified black jurors.  The prosecutor then used six of his eighteen peremptory strikes on the qualified black jurors.  When Madison's counsel objected, the trial judge asked the prosecutor to provide a race-neutral explanation for the peremptory strikes of the black jurors. However, instead of doing so, the prosecutor protested that Madison had not established a prima facie case.  When the trial judge asked the prosecutor what he meant, the prosecutor erroneously responded that to establish a prima facie case Madison not only had to show that he was a member of the group suffering discrimination, but "that the State has a history of racial discrimination."[FN5]
>
>> FN5. This proffered standard requiring a "history of racial discrimination" is incorrect and mirrors the prima facie requirements under <u>Swain v. Alabama</u>, 380 U.S. 202, 85 S. Ct. 824 (1965), which <u>Batson</u> specifically overruled for being too onerous.  <u>Batson</u>, 476 U.S. at 92, 106 S. Ct. [at 1721] ("Since this interpretation of <u>Swain</u>

4

has placed on defendants a crippling burden of proof, prosecutors's peremptory challenges are now largely immune from constitutional scrutiny . . . . [W]e reject this evidentiary formulation").

Madison's counsel responded that the prosecutor had cited the wrong test under Batson and that, under the correct test, there were sufficient relevant facts to support an inference of discrimination, which was all Madison's counsel had to show at this stage of the proceeding.  Madison's counsel noted that the prosecutor had not asked meaningful questions to any of the challenged black jurors and in fact, for three such jurors, posed no questions at all.  He noted that the challenged jurors only shared the common characteristic of race as they had heterogeneous backgrounds of different sexes, ages, occupations, and education.  He also noted that the subject matter of the case involved racial sensitivities as the defendant was black and the victim was a white police officer. [FN6]

> FN6. Madison's counsel also raised the possibility that the fact might come out in trial that Madison had at the time a white girlfriend.

Without addressing Madison's arguments or asking the prosecutor for a race-neutral reason for the strikes, the trial judge held that Madison's counsel had not proved "bias on the part of the State" and then denied the motion.  The Court of Criminal Appeals affirmed that ruling, concluding that the trial judge had not erred in denying Madison's Batson claim, because Madison had not "established purposeful racial discrimination." Madison III, 718 So. 2d at 102.

Madison V, 677 F.3d at 1337–38 (footnote omitted).  We held that the Alabama Court of Criminal Appeals "reached a decision contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1) because the court increased Madison's prima facie burden beyond what Batson requires."  Id. at 1338.

5

Once we determined that the state court's decision was not entitled to deference under § 2254(d), we were required to review the merits of Mr. Madison's Batson claim de novo.  See McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a de novo review of the record.").  On de novo review, we held "[t]he record reflects that Madison presented to the Alabama courts several relevant circumstances that in total were sufficient to support an inference of discrimination."  Madison V, 677 F.3d at 1339.  Because Mr. Madison had established a prima facie case of discrimination under Batson, we remanded the case for the District Court "to complete the final two steps of the Batson" analysis.  Id.

On remand, the District Court held an evidentiary hearing.  The state presented two witnesses: (1) a female juror Geraldine Adams, who is black; and (2) trial prosecutor John Cherry.  The District Court also admitted into evidence three state's exhibits: (1) jury strike list with hand written notations of jurors' occupations; (2) Mr. Madison's witness list from trial; and (3) Mr. Cherry's handwritten notes from voir dire.

Ms. Adams testified that at the time of Mr. Madison's trial her husband was a "mental health worker" at Searcy Hospital.  Mr. Cherry testified that he worked

6

with the Mobile County District Attorney's Office in 1994 and prosecuted Mr.

Madison's third trial. Mr. Cherry authenticated his own handwritten notes from

voir dire and confirmed these notes were made "contemporaneous" with the jury

selection. Given that nineteen years had passed since the voir dire, Mr. Cherry said

he would not be able to testify to the matters regarding the voir dire "fully and

accurately" without his notes. Then, Mr. Cherry read into the record the last two

pages of his voir dire notes, which indicate his purported reasons for exercising his

peremptory strike for each of the six black jurors. Those reasons were:

> [Juror] 169, Mr. Dawson, knows Cozy Brown, a defense witness, someone whose store he goes to. Felt he may give more credence to that testimony.

> [Juror] 160, Ms. Smith, a therapist at Mobile area, Retarded Citizen's Center. Court knows that testimony as to defendant's mental state has been crucial in this case and even though defense withdrawn, there may very well be testimony again.

> [Juror] 163, Mr. McQueen. Grew up around defendant, played with him, went to his house. Also has a 1983—and that's shorthand for marijuana—arrest, MJ arrest. Knows some of the witnesses. And this last line, I suppose, I'm quoting him. At some point he must have said this. In quotations I have "I'd rather not sit."

> [Juror] 135, Ms. Adams. Husband, married to a mental health worker. Again, mental disease or at least some mental status will be an issue in at least one phase of this trial.

> [Juror] 137, Mr. Hall knew at least four of these witnesses, some of whom were defense witnesses.

7

[Juror] 148, Mr. Brown.  Stood up and said he would have to be convinced beyond all doubt as to defendant's guilt.  He would not follow the law.[3]

Mr. Cherry also explained that at the time of Mr. Madison's 1994 trial it was his practice to document his reasons for striking jurors for <u>Batson</u> purposes.  Mr. Cherry testified that his notes represented his true reasons for striking black jurors and denied that race was a factor in striking any black jurors in Mr. Madison's case.

On cross examination, prosecutor Mr. Cherry indicated that "race" was a consideration during voir dire:

[Defense]     Just a couple more questions. At the time of the trial in [19]94, was race a consideration when you struck this jury?

[Mr. Cherry]  It has to be one of the factors because you know how these things turn out when the defense is striking all white and you realize where they are going with that.  I'm not sure, of course, at this point what their reasons were.  I suspect if they struck all white, it had to be some indication about race there, ma'am.

[Defense]     So it was a consideration when you were doing your own striking?

[Mr. Cherry]  No, ma'am.  As you can see, we were looking for folks that had prior arrests, people who grew up with Mr. Madison,

---

[3] Mr. Madison abandoned his challenge regarding juror Brown because he did not raise it in his initial brief.  <u>Access Now, Inc. v. Sw. Airlines Co.</u>, 385 F.3d 1324, 1330 (11th Cir. 2004) ("Any issue that an appellant wants [us] to address should be specifically and clearly identified in the brief . . . . Otherwise, the issue—even if properly preserved at trial—will be considered abandoned." (quotation marks omitted)).  The District Court found that Mr. Madison failed to establish pretext for this strike.

people who knew witnesses, someone who knew Dr. Amyx.[4] I was very much aware, of course, that we had a black defendant and a white victim, yes, ma'am.

[Defense]     And you were aware of the cases between 1985 and 1994 where the state appellate courts had reversed the Mobile County District Attorney's Office for violation of <u>Batson</u>?

[Mr. Cherry]   Yes, ma'am.

On redirect, Mr. Cherry explained that his awareness of <u>Batson</u> violations in his office prior to 1994 caused him to "exercise[] caution" in his decision making when striking jurors.

The defense presented the testimony of one witness, Angela Roberts, a retired director of library services and academic support services at Alabama Southern Community College.  Ms. Roberts testified that Cozy Brown (who was listed as a defense witness at trial) is a prominent owner of a fish market in Prichard, Alabama, a predominantly black community, whom most black residents of Prichard would know.  After Ms. Roberts testified, the defense rested and the parties presented argument.  The District Court took the matter under submission and later issued a written order finding that Mr. Madison had failed to prove purposeful discrimination or pretext on the part of the prosecution.

---

[4] Mr. Madison's mental health was potentially an issue in this case.  Dr. Amyx was a possible mental health witness for the defense.

9

## II.    STANDARDS OF REVIEW

A District Court's grant or denial of a habeas corpus petition is reviewed de novo.  Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010).  Although we review de novo the District Court's conclusions on legal questions and mixed questions of law and fact, we generally review the District Court's findings of fact for clear error.  Terrell v. GDCP Warden, 744 F.3d 1255, 1261 (11th Cir. 2014).  With respect to Batson's third step, the Supreme Court has "explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."  Hernandez v. New York, 500 U.S. 352, 364, 111 S. Ct. 1859, 1868 (1991) (plurality opinion).[5]

Nonetheless, the parties here dispute what standard of review should apply to the District Court's finding on discriminatory intent in this case.  Mr. Madison argues "[t]he issues raised in this appeal require independent reassessment of the proper application of federal constitutional principles to the record facts."  He relies in part on Cuyler v. Sullivan, 446 U.S. 335, 341–42, 100 S. Ct. 1708, 1714–

---

[5]  In Hernandez, the Court noted "[t]he precise formula used for review of factfindings, of course, depends on the context."  500 U.S. at 365, 111 S. Ct. at 1869.  The context in Hernandez involved the Supreme Court's direct review of a state court's rejection of a criminal defendant's Batson claim.  Id. at 355, 111 S. Ct. at 1864.  In that context, the four Justice plurality of the Court held it would not "overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous."  Id. at 369, 111 S. Ct. at 1871 (plurality opinion by Kennedy, J., joined by Rhenquist, C.J., White and Souter, JJ.).  Two concurring justices agreed with the plurality of the Court on this point.  Id. at 372, 111 S. Ct. at 1873 (concurring opinion of O'Connor, J., joined by Scalia, J.) ("I agree with the plurality that we review for clear error the trial court's finding as to discriminatory intent . . . .").

15 (1980),[6] and Holder v. Welborn, 60 F.3d 383, 388 (7th Cir. 1995) (reviewing Batson claim de novo after case remanded for Batson hearing in District Court in front of different judge after state trial).  The state concedes that de novo review might apply to Batson's second step, but argues the District Court's determination at Batson's third step is a pure finding of fact that cannot be reversed unless clearly erroneous.  In support, the state cites Hernandez, 500 U.S. at 369, 111 S. Ct. at 1871; United States v. Walker, 490 F.3d 1282, 1294 (11th Cir. 2007), United States v. Houston, 456 F.3d 1328, 1334 (11th Cir. 2006) ("We review for clear error a trial judge's finding that a prosecutor has exercised peremptory strikes free of discriminatory intent."), and United States v. Stewart, 65 F.3d 918, 923 (11th Cir. 1995).

Neither party has cited any Eleventh Circuit authorities applying a de novo standard of review to a district court's determination of purposeful discrimination at Batson's third step in the procedural posture of Mr. Madison's case.  Specifically, the parties have presented no precedent governing our review of a federal district court fact finding made after its own evidentiary hearing to review a Batson challenge made many years ago before a different judge in a state criminal

---

[6]  In Cuyler, the Supreme Court determined that the Pennsylvania Supreme Court's conclusion that defense attorneys "did not engage in multiple representation is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case."  446 U.S. at 342, 100 S. Ct. at 1715.  Nothing in Cuyler supports a conclusion that a finding on discriminatory intent at Batson's third step should be treated as a mixed question of law and fact, rather than an issue of pure fact.

11

trial.  The three Eleventh Circuit cases cited by Alabama are not controlling because each of those cases involves a federal direct appeal of a Batson claim where the same District Court judge presided over the actual jury selection in the case.  See Walker, 490 F.3d 1287; Houston, 456 F.3d at 1331–33; Stewart, 65 F.3d 921.  However, there is Eleventh Circuit precedent for applying the clear error standard of review to a federal district court's determination of a Batson claim after a federal evidentiary hearing.  See Cochran v. Herring, 43 F.3d 1404, 1408 (11th Cir. 1995) ("The ultimate question of whether Cochran has established purposeful discrimination in violation of Batson is a question of fact subject to deferential review. A district court finding of purposeful discrimination in violation of Batson will not be overturned unless clearly erroneous." (citing Hancock v. Hobbs, 967 F.2d 462, 465 (11th Cir.1992)).[7]

Mr. Madison relies on Holder as persuasive authority for us to review a district court's third step Batson determination de novo.  Even assuming we were not bound to follow Cochran, we would not follow Holder.  In Holder, as here, the

---

[7]  In Cochran, this Court affirmed a district court's grant of relief on a Batson claim to an Alabama death row prisoner.  43 F.3d at 1405.  The procedural posture in Cochran is similar to Mr. Madison's.  Both involve a federal district court's adjudication of a Batson claim after consideration of evidence presented at a federal evidentiary hearing.  See Cochran, 43 F.3d at 1407.  But unlike Mr. Madison's case, the standard of review was not a disputed issue in Cochran.  This might explain why the decision in Cochran did not explain why it was applying a clearly erroneous standard of review, other than citing Hancock, 967 F.2d 462.  See Cochran, 43 F.3d at 1408.  Hancock involved review of a federal district judge's Batson determinations made during the voir dire of a federal trial the judge presided over, a different procedural posture.  See Hancock, 967 F.2d at 463, 465–66.  Because the parties dispute the standard of review, and the issue was not disputed in Cochran, we think it important to explain our reasoning on this important matter.

12

habeas petitioner's case was remanded for a <u>Batson</u> hearing in federal District Court many years after a state trial in which the prosecutor had not given reasons supporting his strikes.  <u>Holder</u>, 60 F.3d at 388.  The Seventh Circuit recognized in <u>Holder</u> that ordinarily a reviewing court will only reverse the findings of a district court about whether a <u>Batson</u> error occurred, if these findings were clearly erroneous.  <u>Id.</u>  That is so, the Court explained, because typically the <u>Batson</u> findings being reviewed were made by the same trial judge who presided over the voir dire.  <u>Id.</u>  But <u>Holder</u> held the rationale for using the clearly erroneous standard does not apply where the <u>Batson</u> hearing was conducted before a federal magistrate more than eight years after the voir dire actually took place in state court.  <u>Id.</u>  The Seventh Circuit emphasized the federal magistrate judge was not in the same position as the judge who had presided.  <u>Id.</u>  Also, the Court noted the trial prosecutors who testified at the federal evidentiary hearing had to rely on the voir dire transcript and contemporaneously taken notes to testify at the federal hearing.  <u>Id.</u>  Under these circumstances, the Seventh Circuit reviewed the <u>Batson</u> claim <u>de novo</u>, reasoning no deference was due the magistrate judge's and District Court's findings because each court had essentially been provided with the same "cold record."  <u>Id.</u>

Unlike the Seventh Circuit in <u>Holder</u>, we cannot say that no deference is due the District Court's <u>Batson</u> determination in the circumstances here, especially its

13

credibility findings about Mr. Cherry. Findings of fact are reviewed for clear error "even when the district court's findings are drawn solely from documents, records, or inferences from other facts." Thompson v. Nagle, 118 F.3d 1442, 1447 (11th Cir. 1997); see also Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."); Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574, 105 S. Ct. 1504, 1511–12 (1985); United States v. Lebowitz, 676 F.3d 1000, 1009 (11th Cir. 2012) (per curiam) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony." (quotation marks and alterations omitted)).

Notably, the District Court here considered more than the prosecutor's trial notes and the testimony authenticating it. The District Court heard the live testimony of Mr. Madison's trial prosecutor and had the opportunity to observe his demeanor when he offered his explanations for striking the jurors he did. While Mr. Cherry relied on his notes to provide his reasons for striking individual jurors, he never testified that he had no recollection of the decisions he made during Mr. Madison's voir dire. In fact, Mr. Cherry was able to answer several questions about his strategy in picking the jury, his awareness of the Mobile County District Attorney Office's history of Batson violations, and his experience as a defense

14

attorney. His testimony about these things went beyond the four corners of his voir dire notes. For example, Mr. Cherry testified that he was aware of cases between 1985 and 1994 in which the state appellate courts had reversed the Mobile County District Attorney's Office for Batson violations. When asked how this troublesome history of Batson violations would affect his decision making during voir dire, Mr. Cherry said, "we exercised caution." Mr. Cherry also testified that race was not a factor in his decisions to make peremptory strikes in Mr. Madison's case.[8]

In light of Mr. Cherry's testimony, and the fact that he was subject to cross examination by defense counsel, the District Court was in a superior position to assess Mr. Cherry's credibility and the genuineness of his explanations for striking black jurors at Batson's third step. See Batson, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). On this record, we decline to follow Holder. We are also mindful that the Supreme Court has rejected, albeit in a different procedural context, the notion of "'independent' appellate review of a

---

[8] Of course, a prosecutor's mere affirmation of good faith or denial of discriminatory intent is insufficient to rebut a prima facie case of discrimination. See Purkett v. Elem, 514 U.S. 765, 769, 115 S. Ct. 1769, 1771 (1995) (per curiam); Bui v. Haley, 321 F.3d 1304, 1316 (11th Cir. 2003) (holding that the "State failed to satisfy its Batson burden of coming forward with a race-neutral explanation" where the only evidence was the prosecutor's "good faith assertions at trial that he struck no one due to race").

15

trial court's rejection of a <u>Batson</u> claim."  <u>Hernandez</u>, 500 U.S. at 366–69, 111 S. Ct. at 1870–71.

Instead, we review the District Court's conclusion on the ultimate question of discriminatory intent at <u>Batson</u>'s third step as a finding of fact that "must not be set aside unless clearly erroneous, and [we] must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6); <u>see also</u> <u>Hernandez</u>, 500 U.S. at 364, 111 S. Ct. at 1869 ("<u>Batson</u>'s treatment of intent to discriminate as a pure issue of fact, subject to review under a deferential standard, accords with our treatment of that issue in other equal protection cases.").

## III.    DISCUSSION

We remanded this case "for the district court to complete the final two steps of the <u>Batson</u> proceedings."  <u>Madison V</u>, 677 F.3d at 1339.  Before turning to the District Court's <u>Batson</u> analysis, we pause to emphasize that it was proper, and indeed necessary, for the District Court to conduct an evidentiary hearing on remand.

### A.  Necessity of Federal Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474, 127 S. Ct. 1933, 1940 (2007).

16

Our previous determination that Mr. "Madison met his burden of establishing a prima facie case," Madison V, 677 F.3d at 1339, coupled with the fact that the prosecutor stated no reasons for his peremptory strike of black jurors, required the District Court to receive and consider new evidence in order for it to conduct the analysis mandated by Batson. See United States v. Ochoa–Vasquez, 428 F.3d 1015, 1046 n.40 (11th Cir. 2005) (recognizing that if the Batson objector's "evidence establishes a prima facie case, then we would need to remand to the district court for further Batson proceedings, including a statement of the reasons by the government for . . . its peremptory strikes"); Paulino v. Castro, 371 F.3d 1083, 1092 (9th Cir. 2004) (same).

In addition, the District Court properly determined that the Supreme Court's decision in Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388 (2011), did not apply to the remand proceedings. See id. at 1398 (holding that a federal court must determine whether a habeas petitioner has satisfied § 2254(d) based only on the "record that was before the state court that adjudicated the claim on the merits"). This Court's decision in Mr. Madison's first appeal that § 2254(d)'s deference did not apply was based solely on the record before the Alabama Court of Criminal Appeals at the time it rendered its decision in Madison III. Nothing in Pinholster,[9]

---

[9] In Pinholster, the Supreme Court determined that the petitioner failed to show that the state court unreasonably applied federal law within the meaning of 28 U.S.C. § 2254(d) when it adjudicated his claim. 131 S. Ct. at 1401–02. Pinholster did not address what happens after a

17

or any other principle of habeas corpus, bars a District Court from conducting an

evidentiary hearing where, as here: (1) the federal claim was adjudicated on the

merits in state court; (2) there is a determination based only on the state court

record that the petitioner has cleared the § 2254(d) hurdle; and (3) the habeas

petitioner tried, but was not given the opportunity to develop the factual bases of

the claim in state court within the meaning of 28 U.S.C.

---

petitioner satisfies his burden under § 2254(d) beyond noting that § 2254(e)(2) continues to have force.  Id. at 1400–01.  However, Justice Breyer's separate opinion in Pinholster is instructive about when an evidentiary hearing may be available:

> Like the Court, I believe that its understanding of 28 U.S.C. § 2254(d)(1) does not leave AEDPA's hearing section, § 2254(e), without work to do.  An offender who believes he is entitled to habeas relief must first present a claim (including his evidence) to the state courts.  If the state courts reject the claim, then a federal habeas court may review that rejection on the basis of the materials considered by the state court.  If the federal habeas court finds that the state-court decision fails (d)'s test (or if (d) does not apply), then an (e) hearing may be needed.

Id. at 1412 (Breyer, J., concurring in part and dissenting in part).  Elsewhere the Supreme Court has also explained, "[w]hen a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 953, 127 S. Ct. 2842, 2859 (2007); see also Williams v. Taylor, 529 U.S. 362, 406, 120 S. Ct. 1495, 1520 (2000) (noting that "a federal court will be unconstrained by § 2254(d)(1) . . . [if] the state-court decision falls within that provision's 'contrary to' clause"); Milton v. Miller, 744 F.3d 660, 670–71 (10th Cir. 2014) (remanding for an evidentiary hearing and noting "[Petitioner's] satisfaction of the § 2254(d)(1) standard . . . requires us to review de novo his ineffective assistance of appellate counsel claim, rather than deferring to the [state court's] resolution of that claim." (emphasis added)); Sanchez v. Roden, 753 F.3d 279, 307 (1st Cir. 2014) ("Pinholster, we believe, does not prohibit an evidentiary hearing once a petitioner has successfully shown the state court unreasonably applied federal law."); Smith v. Cain, 708 F.3d 628, 635 (5th Cir. 2013) (holding that "Pinholster's limitation on federal evidentiary hearings does not apply once the district court conclude[s], solely on the basis of the state court record, that the state trial court unreasonably applied federal law"); Mosley v. Atchison, 689 F.3d 838, 844 (7th Cir. 2012) ("If § 2254(d) does not bar relief, then an evidentiary hearing may be needed.").

18

§ 2254(e)(2).  Mr. Madison cannot be faulted for failing to develop the record to support his Batson claim where he made a timely Batson objection, the prosecutor refused to state any reasons for his peremptory strikes of black jurors (indeed, the prosecutor misstated the law), and the state courts unreasonably determined Mr. Madison had not made a prima facie case of discrimination.   Under these circumstances, an evidentiary hearing in federal court was required.

### B.    Batson's Second Step

Under Batson, "once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)."  Elem, 514 U.S. at 767, 115 S. Ct. at 1770.  Batson's second step "does not demand an explanation that is persuasive, or even plausible."  Id. at 768, 115 S. Ct. at 1771.  "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez, 500 U.S. at 360, 111 S. Ct. at 1866.

As set out above, the state presented the prosecutor's notes from voir dire, the testimony of Ms. Adams, and the testimony of the prosecutor to establish that Alabama's reasons for striking six black jurors were valid and race-neutral.  After

19

considering the state's explanations, the District Court concluded the "prosecutor's explanations for striking jurors are credible, valid and race-neutral."

We cannot say the District Court committed any error in finding that the state satisfied its low burden at Batson's second step. The explanations offered by the state for its strikes are facially valid and race-neutral.[10] See Elem, 514 U.S. at 768, 115 S. Ct. at 1771 ("It is not until the third step that the persuasiveness of the justification becomes relevant . . . ."). Indeed, Mr. Madison does not dispute that the state's proffered reasons are race-neutral. Rather, he argues the prosecutor's reasons were pretextual.

### C.    Batson's Third Step

Once a race-neutral explanation is tendered at Batson's second step, "the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." Elem, 514 U.S. at 767, 115 S. Ct. at 1770–71. The burden on Mr. Madison at Batson's third step is to prove purposeful discrimination by a preponderance of the evidence.[11] See Johnson, 545 U.S. at

---

[10]  Although the burden at step two is low, "'general assertions' are insufficient, and that the State may not 'rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections.'" McGahee, 560 F.3d at 1259 (quoting Batson, 476 U.S. at 98, 106 S. Ct. at 1723–24). Instead, the state must be "clear and reasonably specific" in providing "legitimate reasons" for its peremptory strikes. Batson, 476 U.S. at 98 n.20, 106 S. Ct. at 1724 n.20 (quotation marks omitted).

[11]  For Mr. Madison, the state court made no factual determination at Batson's third step that could be entitled to a presumption of correctness. See 28 U.S.C. § 2254(e)(1). Because the state courts unreasonably determined Mr. Madison did not make a prima facie case of discrimination

20

170, 125 S. Ct. at 2417 ("Thus, in describing the burden-shifting framework, we assumed in Batson that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated."). The objecting party may satisfy its burden of persuasion by showing that the moving party's race-neutral reasons were pretextual. See Miller-El v. Dretke, 545 U.S. 231, 247–49, 125 S. Ct. 2317, 2329–30 (2005) (Miller-El II) (analyzing for pretext the prosecution's reasons for striking a prospective juror). The Supreme Court has taught us:

> [T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. . . . [T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

Miller-El v. Cockrell, 537 U.S. 322, 338–39, 123 S. Ct. 1029, 1040 (2003) (Miller-El I). Again, the District Court's decision on the ultimate question of discriminatory intent is a finding of fact that we will not set aside unless clearly

---

at Batson's first step, the state courts did not consider Batson's second and third steps. Indeed, given the prosecutor's apparent belief that he was not required to provide race-neutral reasons, the state courts could not have proceeded past Batson's second step. Cf. Bui, 321 F.3d at 1318 (finding habeas petitioner was entitled to habeas relief on his Batson claim where state failed to rebut petitioner's prima facie case of race discrimination at Batson's first step).

21

erroneous.  See Section II, supra; see also Hernandez, 500 U.S. at 369, 111 S. Ct. at 1871.

We have carefully reviewed the record and considered the totality of relevant circumstances bearing on the ultimate question of whether the prosecutor excused even a single black juror based on race.  See Parker, 565 F.3d at 1270 ("It is not necessary to show that all or even a majority of the prosecutor's strikes were discriminatory; any single strike demonstrated to result from purposeful discrimination is sufficient."); see also Snyder v. Louisiana, 552 U.S. 472, 478, 128 S. Ct. 1203, 1208 (2008) ("Because we find that the trial court committed clear error in overruling petitioner's Batson objection with respect to [one juror], we have no need to consider petitioner's claim regarding [a second juror].").  If our standard of review were de novo, this would be a difficult case.  Both the state and Mr. Madison point to evidence and inferences in the record that support their respective interpretations of the prosecutor's motives for striking black jurors.  On the one hand, the state clearly articulated facially valid race-neutral reasons to support each of its strikes.  More importantly, each of the state's race-neutral reasons is supported by the record and "has some basis in accepted trial strategy," at least arguably so.  See Miller-El I, 537 U.S. at 339, 123 S. Ct. at 1040.  This is critical because a facially race-neutral reason, "on its own, does not suffice to answer a Batson challenge."  Adkins v.Warden, Holman CF, 710 F.3d 1241, 1251

22

(11th Cir. 2013); see also Miller-El II, 545 U.S. at 240, 125 S. Ct. at 2325 ("If any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain."). Significantly, this is not a case where the record shows the explanations offered by the prosecutor were applied disparately to black and white prospective jurors. We are also aware that six black jurors served on the jury, 30% more than the population of African Americans in the County, and that the sixty-member jury panel was nearly 75% white. See Madison III, 718 So. 2d at 101 n.3, 102 n.5.

At the same time, the circumstances supporting Mr. Madison's prima facie case were strong. Relevant factors supporting purposeful discrimination include the following:

- the prosecutor peremptorily struck 6 of 13 eligible black jurors;

- the prosecutor did not ask three of these jurors any questions;

- the prosecutor refused to give reasons for his strikes at trial, despite being asked to do so, and misstated the governing law;[12]

- the inter-racial nature of the crime (black defendant and white police officer);[13]

---

[12] After Mr. Madison made his Batson objection at trial, the prosecutor protested that Mr. Madison had not established a prima facie case, arguing wrongly that Mr. Madison had to show "that the State has a history of racial discrimination." Madison V, 677 F.3d at 1338. The prosecutor's proffered standard was "incorrect and mirror[ed] the prima facie requirements under Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824 (1965), which Batson specifically overruled for being too onerous." Madison V, 677 F.3d at 1338 n5.

[13] See Powers v. Ohio, 499 U.S. 400, 416, 111 S. Ct. 1364, 1374 (1991) (recognizing "the race of the defendant may be relevant to discerning bias" where the defendant and struck jurors are

- the heterogeneity of the struck jurors; and

- the Mobile County District Attorney's Office's well-documented history of racially discriminatory jury selection, including at Mr. Madison's first trial.

The history of racial discrimination at the Mobile County District Attorney's Office that prosecuted Mr. Madison is significant.  See Miller-El I, 537 U.S. at 346–47, 123 S. Ct. at 1044–45 (according weight to historical evidence of racial discrimination by district attorney's office and noting that such history is "relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case"); see also Miller-El II, 545 U.S. at 266, 125 S. Ct. at 2340 ("If anything more is needed for an undeniable explanation of what was going on, history supplies it.").  In the eight years between the 1986 decision in Batson and Mr. Madison's third trial in 1994, Alabama appellate courts had found Batson violations by the Mobile County District Attorney's Office on seven different occasions, including once at Mr. Madison's first trial.[14]  Also relevant, in 1990 this Court found that the Mobile County District Attorney's Office had

---

the same race); see also Johnson, 545 U.S. at 167, 125 S. Ct. at 2415 (noting, in the context of a Batson objection, "the highly relevant circumstances that a black defendant was charged with killing his White girlfriend's child") (quotation marks omitted).

[14]  See Jessie v. State, 659 So. 2d 167 (Ala. Crim. App. 1994); Carter v. State, 603 So. 2d 1137 (Ala. Crim. App. 1992); Jackson v. State, 557 So. 2d 855 (Ala. Crim. App. 1990); Harrell v. State, 571 So. 2d 1269 (Ala. Crim. App. 1990); Madison I, 545 So. 2d 94; White v. State, 522 So. 2d 323 (Ala. Crim. App. 1987); Williams v. State, 507 So. 2d 566 (Ala. Crim. App. 1987). During oral argument, however, Mr. Madison's counsel forthrightly conceded that there was no evidence that Mr. Cherry was directly involved in any of the seven trials where a Batson violation was found.

24

engaged in the "systemic exclusion" of blacks from jury service, in violation of

Swain.  See Jones v. Davis, 906 F.2d 552, 554–55 (11th Cir. 1990) (per curiam).

Nonetheless, we defer to the findings of the District Court unless they are

clearly erroneous.  Hernandez, 500 U.S. at 369, 111 S. Ct. at 1871.  The District

Court did not clearly err in finding Mr. Madison "failed to prove purposeful

discrimination or pretext."  Neither can we say that the District Court clearly erred

when, "after considering the written notes and testimony of John Cherry, [it

concluded] that the prosecutor's explanations for striking the jurors [were]

credible, valid and race-neutral."

On remand the District Court gave both parties an opportunity to present

evidence, briefing, and argument on the ultimate issue of discriminatory intent.

After hearing the evidence, the District Court issued a seventeen-page order.  The

District Court's order properly noted Batson's third step "demands consideration

of the totality of the circumstances."  See also McGahee, 560 F.3d at 1261

("Because courts must weigh the defendant's evidence [of purposeful

discrimination] against the prosecutor's articulation of a 'neutral explanation,'

courts are directed by Batson to consider 'all relevant circumstances' in the third

step of the Batson analysis.").  The district judge also noted "[t]he reasons stated

by the prosecutor provide the only reasons on which the prosecutor's credibility is

to be judged."  Doc. 79 at 11 (quoting Parker v. Allen, 565 F.3d 1258, 1271 (11th

Cir. 2009)).  Further, the District Court correctly acknowledged the

"[c]ircumstances that may support a finding of pretext are varied."  Id. at 12 (citing

Parker, 565 F.3d at 1271).[15]

The District Court then carefully considered the state's proffered reasons

supporting its peremptory strikes, once again grouping them into three broad

categories: (1) "Employment/Occupation Based Strikes" (jurors Adams and

Smith); (2) "Knew/Associated with Defendant or Defense Witness Strikes" (jurors

Dawson, Hall, and McQueen); and (3) "Death Penalty Apprehension Strike (juror

Brown).  The District Court separately concluded that each of the three categories

was generally recognized as a valid race-neutral reason for striking prospective

jurors.

---

[15]  In Parker, we said:

> Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned. Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve. A prosecutor's reasonable explanation for objecting to a black panelist based on his or her opinions or comments may be undercut by the prosecution's failure to object to other white panelists who expressed similar views, and may be evidence of pretext.

565 F.3d at 1271 (internal citations omitted).

For example, the District Court determined "[s]trikes based on employment / occupation have generally been upheld as a valid race neutral reason for striking prospective jurors." Doc. 79 at 13 (citing case law including J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 142 n.14, 114 S. ct. 1419, 1428 n.14 (1994) (suggesting that peremptory challenges based on a status or occupation do not raise the same level of concern as those based on race or gender)); see also United States v. Steele, 178 F.3d 1230, 1235–36  (11th Cir. 1999) (recognizing, in the context of an equal protection challenge based on gender discrimination during jury selection, that peremptory strikes based on a prospective juror's occupation may be gender-neutral).  Similarly, the District Court recognized that striking a venire member because they knew the defendant, defendant's family, or a defense witness is a race-neutral reason for a strike.  Doc. 79 at 14–15 (citing e.g., United States v. Lewis, 593 F.3d 765, 770 (8th Cir. 2010) (finding as race-neutral, a prosecutor's explanation that she struck two prospective jurors because they personally knew a defense witness); United States v. Williamson, 53 F.3d 1500, 1509 (10th Cir. 1995) (noting proffered reasons given for striking black prospective juror—that juror knew the defendant, was acquainted with a witness, and was familiar with the subject matter of the trial—were facially race-neutral for the purposes of Batson violation)).

27

The District Court also considered and rejected Mr. Madison's arguments that the prosecutor's race-neutral explanations were mere pretext.[16]  For example, with respect to black jurors Ms. Adams and Ms. Smith—whom the prosecutor said he struck based on their occupation or spouse's occupation in the mental health field—the District Court considered Mr. Madison's argument that comparator evidence shows the prosecutor's reasons for these strikes "were pretext for racial discrimination."[17]  Mr. Madison argued at the <u>Batson</u> hearing "that there was a white juror [Doss], who was not struck by the state, who indicated that she knew Dr. Brown," a psychiatrist who the state had listed as a witness.  Ms. Doss stated during voir dire that she had been a psychiatric patient of Dr. Brown.  The District Court rejected Mr. Madison's argument because Dr. Brown was a state witness and Ms. Doss was neither a mental health worker nor married to a mental health worker.  On this record, we agree with the District Court's implicit determination

---

[16]  The District Court separately considered additional facts that Mr. Madison argued show race consciousness permeated jury selection, such as the interracial nature of the crime, the history of <u>Batson</u> violations in the Mobile County District Attorney's Office, and a "notation in the [prosecutor's] handwritten notes that a black female felt the death penalty was a deterrent, but similar notations were not recorded for the white jurors who responded the same."  This bolsters our view that the District Court carefully considered all the relevant circumstances bearing on the genuineness of the prosecutor's explanations, even if we may have weighed them differently.

[17]  Again, the prosecutor testified during the federal evidentiary hearing that Ms. Smith was a therapist at the Retarded Citizens Center in the Mobile area and Ms. Adams was married to a mental health worker.  The prosecutor's notes also indicated that "mental disease or at least some mental status will be an issue in at least one phase of this trial."  Further, the prosecutor explained his "strategy regarding prospective jurors who had any type of mental health field connections": "[I]t's something to take into consideration, people might be sympathetic to either mental illness, disease, or defect or some reduced capacity.  So you have to consider that."

28

that there were relevant differences between Ms. Doss, who is white, and Ms. Adams and Ms. Smith, who are black.  See Parker, 565 F.3d at 1271 ("The prosecutor's failure to strike similarly situated jurors is not pretextual, however, where there are relevant differences between the struck jurors and the comparator jurors." (quotation marks omitted)).

Similarly, the District Court considered Mr. Madison's argument that the prosecutor's strikes "based on a potential juror's knowledge of, or association with, defense witnesses or the defendant" were suspect because the prosecutor failed to ask follow-up questions related to these reasons.  For example, Mr. Madison argued that although the record showed that Mr. Hall, a black juror, was "acquainted" with defense witness Cozy Brown, the prosecutor did not ask Hall any questions to ascertain the nature of his relationship with Mr. Brown.  The District Court noted that the prosecutor "did not follow up with any juror with additional questions" and found that the prosecutor's reasons were generally recognized to be valid and race-neutral.  The District Court found "no evidence of pretext for racial discrimination in the fact that Mr. Cherry did not ask follow-up questions or in the fact that one (1) of the defense witnesses, Mr. Cozy Brown, was well known in the community."[18]

---

[18]  Mr. Madison points out that the prosecutor removed potential jurors Messrs. Dawson, Hall, and McQueen, who are black, "in part because of their knowledge of, or acquaintance with, Cozy Brown."  Mr. Madison argues "this justification is suspect, given that it applies

On this record, we cannot say the District Court clearly erred in making any of its factfindings.  The clearly erroneous standard is very deferential.  We may not reverse a District Court under the clearly erroneous standard of review where, as here, "the district court's account of the evidence is plausible in light of the record viewed in its entirety."  Anderson, 470 U.S. at 574, 105 S. Ct. at 1511.  This is so even if we were convinced, had we been sitting as the trier of fact, that we "would have weighed the evidence differently."  Id.

After hearing the testimony and reviewing the evidence, the District Court credited the prosecutor's race-neutral explanations for striking six black jurors and rejected Mr. Madison's arguments that the prosecutor's reasons were pretextual.[19] In the end, and based on our review of the entire record, the dispositive question in this appeal is answered by our conclusion that there are two plausible views of the

---

predominately to African Americans."  As a matter of law, we agree that the nature of this justification for striking black panel members could support a finding of discrimination in this case.  See Hernandez, 500 U.S. at 363, 111 S. Ct. at 1868 ("If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.").  But the District Court clearly considered this possibility and found it was not a pretext for racial discrimination, as noted above.  We cannot say the District Court's conclusion is clearly erroneous on this record.

[19]    This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations . . . . Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.

Anderson, 470 U.S. at 575, 105 S. Ct. at 1512.  This is not a case, however, where such factors are present such that we may find clear error despite the District Court's credibility findings.

30

evidence, both of which have some support.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Id.

## IV.    CONCLUSION

We affirm the District Court's judgment denying Mr. Madison's Batson claim on the merits.

**AFFIRMED.**

31