[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16972
Non-Argument Calendar

_____

D.C. Docket No. 1:15-cr-00021-WLS-TQL-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LEONARDO HERNANDEZ TRIANA,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(January 14, 2019)

Before WILSON, MARTIN, and JORDAN, Circuit Judges.

PER CURIAM:

Leonardo Hernandez Triana appeals his conviction, after a jury trial, for

access device fraud and identity theft.  He argues the district court erred when it

denied his motion to suppress evidence recovered from a search of his vehicle, rejected his Batson challenges to the prosecution's decision to strike five African American jurors, and denied his motion for a judgment of acquittal. After careful consideration, we affirm.

## I. BACKGROUND

### A.    FACTUAL BACKGROUND

On October 21, 2014, Georgia State Patrol Sergeant Dwayne Massey pulled over a truck travelling northbound on I-75 in Turner County, Georgia because it had a tinted license plate cover. A tinted cover violates Georgia law, which requires license plates to be visible and legible. See O.C.G.A. § 40-2-41 ("No license plate shall be covered with any material unless the material is colorless and transparent.").

Triana was driving the truck. Sergeant Massey asked for his license and registration, which Triana gave. The truck was registered to Yadina Valdes Diaz, who was sitting in the passenger seat at the time of the stop. Sergeant Massey asked if Triana spoke English, to which he responded, "A little bit." Sergeant Massey then attempted to explain the problem with the license plate cover, but Triana "didn't really seem that he understood." Triana was able to speak with Sergeant Massey but did so in "broken English." Sergeant Massey told Triana to

2

get out of the truck, and they walked to the rear of the truck, where Sergeant Massey pointed out the tinted cover.

Triana explained that the cover was legal in Florida and promised he would fix it. When Sergeant Massey asked Triana where he was going, Triana explained he was on his way to Bowling Green, Kentucky. Sergeant Massey next spoke with the passenger, Diaz, who also told Sergeant Massey they were headed for Kentucky. Diaz told Sergeant Massey she owned the truck but did not have identification with her.

Sergeant Massey directed Triana to wait in the truck. Sergeant Massey then returned to his patrol vehicle, where he logged Triana's license and asked the dispatcher to check Triana's criminal history report. Approximately ten minutes after initiating the stop, Sergeant Massey printed out a written warning for the tinted license plate cover. He also radioed another officer who spoke Spanish, asking for help to communicate with Triana. About one minute later, Sergeant Massey printed a consent-to-search form. Meanwhile, the dispatcher confirmed Triana had a valid driver's license and the vehicle was registered to Diaz.

Shortly thereafter, Sergeant Massey got out of his patrol vehicle. Triana met him at the back of the truck, where Sergeant Massey handed over a copy of the written warning and returned Triana's license and registration. Triana then asked Sergeant Massey where he could find a gas station or store to get a screwdriver to

3

remove the tinted license plate cover. Sergeant Massey replied that the next exit had a few stores where Triana might stop and find a screwdriver. After answering Triana's question, Sergeant Massey observed that in his experience, transporting large objects like the freezer in the back of Triana's truck can be a sign of drug trafficking activity. Following this observation, Sergeant Massey asked Triana if he had any drugs or weapons in the car. Triana said he did not. Apparently unconvinced, Sergeant Massey asked Triana if he "had any objection" to Massey searching the truck for drugs or weapons. Triana did not understand the question at first but then responded "No, nothing."[1] Sergeant Massey asked Triana to sign a consent form for the search, but Triana indicated he did not understand the form. After about a minute of discussing consent, Trooper Mejia arrived on the scene. Trooper Mejia explained, but did not read, the consent form to Triana in Spanish. Triana subsequently agreed the officers could search the truck and signed the form.

Sergeant Massey searched the truck with the assistance of a third officer on the scene. He found a red duffle bag in the back seat. Inside the bag was a pair of rolled up socks that contained twenty Walmart gift cards and two card "skimmer" devices, which are used to read electronic financial information from cards. The officers arrested Triana and Diaz.

---

[1] There is some dispute about whether this answer meant Triana had no objection to the search, or whether he was saying he had nothing illegal in the truck.

4

Later analysis of the gift cards revealed they were encoded with account numbers from financial institutions, rather than Walmart credit information. With the account numbers encoded on the card's magnetic strips, the cards could be used to access bank account funds. The account numbers on the cards did not belong to either Triana or Diaz.

B.    PROCEDURAL BACKGROUND

Triana and Diaz were charged with two counts of fraud in connection with access devices under 18 U.S.C. § 1029(a)(3)–(4), and five counts of aggravated identity theft under 18 U.S.C. § 1028A.

Triana moved to suppress the evidence found in the truck. He argued the officers did not have a valid reason to stop him and that they unlawfully prolonged the traffic stop to search the truck. Triana also contended he did not voluntarily consent to the officers' search of the truck.

On September 17, 2015, the district court held a suppression hearing. At the hearing, Sergeant Massey and Trooper Mejia testified about the traffic stop and their interactions with Triana. The government also presented a video recording of the stop from the dashcam in Sergeant Massey's patrol vehicle.

The district court denied the motion to suppress. It found Sergeant Massey's actions—including the request for criminal history—did not unreasonably prolong the traffic stop. As for the time it took for Trooper Mejia to arrive and Triana to

5

consent to the search, the district court found that "the traffic stop concluded when Massey handed Hernandez Triana the warning ticket, and everything that occurred thereafter was part of a consensual interaction because Hernandez Triana was free to leave."  The district court also found that, based on Triana's age and apparent intelligence, his oral consent to search the truck was "freely and voluntarily given."

Triana and Diaz proceeded to trial.  During jury selection, Triana objected to five of the government's six peremptory strikes, arguing they showed a pattern of racial bias because each of the five jurors struck was African American.  The district court asked the government to provide race-neutral reasons for each strike, which the government did.  The court ultimately rejected Triana's Batson challenge, finding that the government's responses were "more than adequate to establish that [the strikes] were exercised appropriately and not for some unconstitutional purposes."

Sergeant Massey and Trooper Mejia testified during the four-day trial.  The jury also heard from investigators who explained how bank account numbers had been encoded on the magnetic strips of the Walmart gift cards found in the truck. Finally, five witnesses testified they had each used a credit or debit card at a Shell gas station in Greenville, Kentucky, and that the account numbers from their cards had been encoded on the Walmart gift cards without their knowledge.

6

At the close of the government's case in chief, and again after closing arguments, Triana moved for a judgment of acquittal, arguing the government failed to prove joint or exclusive possession of the gift cards and electronic skimmers in the truck. The district court denied the motion.

The jury found Triana and Diaz guilty on all seven counts. The district court sentenced Triana to 38-months imprisonment and Diaz to 36-months imprisonment. This appeal followed.[2]

## II. ANALYSIS

Triana raises three issues in this appeal. First, he argues the district court erred in denying his motion to suppress evidence. Next, he alleges the government violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), by striking five potential jurors on the basis of race. Finally, he asserts the district court abused its discretion when it denied his motion for a judgment of acquittal. We address each argument in turn.

### A.    FOURTH AMENDMENT VIOLATION

This court reviews "the district court's findings of fact for clear error and its application of the law to those facts de novo" when the issue presented on appeal is whether the district court correctly denied the defendant's motion to suppress.

---

[2] Both Triana and Diaz appealed, but Diaz's appeal was dismissed for want of prosecution. We therefore consider only the issues raised in Triana's appeal.

7

United States v. Epps, 613 F.3d 1093, 1097 (11th Cir. 2010). "In reviewing the district court's denial of a motion to suppress, we must take the facts in the light most favorable to the Government." United States v. Watkins, 760 F.3d 1271, 1279 (11th Cir. 2014). "Whether a person consented to a search is, as a general proposition, a matter of fact, and therefore is reviewed for clear error." Id.

Triana first argues that evidence of the Walmart cards and skimmer devices should have been suppressed because they were the result of an unlawfully prolonged traffic stop. We disagree.

The Supreme Court has made clear that officers violate the Fourth Amendment when they prolong a traffic stop " 'beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." Rodriguez v. United States, 575 U.S. __, 135 S. Ct. 1609, 1614–15 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005)). This Court, however, has recognized two limited exceptions to this rule: first, when officers have an "objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring"; and second, if the facts indicate that "the initial detention has become a consensual encounter." United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quotation marks omitted).

The district court did not err when it found that the traffic stop became a consensual encounter when Sergeant Massey provided Triana with a copy of the

8

written warning and returned to Triana his license and registration.  For one, the dashcam footage reveals that after Triana received all his documents, he asked Sergeant Massey for directions to the nearest store so he could purchase a screwdriver to remove the tinted license plate.  This strongly suggests a reasonable person would have felt free to leave.  For another, Sergeant Massey did not immediately respond to Triana's question with a request to search the truck.  Rather, Sergeant Massey provided Triana with directions and then asked Triana whether he would mind if Massey asked a question.  Only when Triana indicated he did not mind did Sergeant Massey ask whether Triana had any illegal drugs or cash in the truck, and following that, whether Triana had any objections to the officers searching his vehicle.

As we outlined in Ramirez, there is no "bright-line litmus test for whether a traffic stop is a seizure or is a consensual encounter."  476 F.3d at 1240 (quotation marks omitted).  But where, as here, the record evidence indicates that the police officers were not behaving in a coercive manner, the exchange was "cooperative in nature," and Triana "had everything he reasonably required to proceed on his journey," we conclude that a reasonable person "would have felt free to terminate the encounter" and decline Sergeant Massey's request to search the truck.  Id.  The conversation between Triana and Sergeant Massey, as well as the questions and

search that followed, were therefore part of an ongoing, consensual encounter and did not prolong the original traffic stop.  Id.

Neither can he prevail on his argument that his consent was invalid because it was not "freely and voluntarily" given.  As the district court observed, "the totality of all the surrounding circumstances" weigh in favor of finding that Triana freely consented to a search of his truck.  Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973).  Trooper Mejia explained in Spanish the contents of the consent form and made clear to Triana that the purpose of the vehicle search would be to look for drugs, firearms, and other contraband.  Triana replied in Spanish that he was fine with the search and that the officers could "go ahead and search," because he didn't have any drugs, firearms, and contraband in the truck.

Although Trooper Mejia did not advise Triana of his right to refuse, this failure is not sufficient in and of itself to render Triana's verbal consent involuntary.  United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) ("The mere fact that Phillips did not inform Lorenzo of his right to refuse consent, given the lack of any coercive behavior on Philips's part, is insufficient to render Lorenzo's consent involuntary.").  This is particularly true when the other relevant factors point in favor of voluntary consent, as they do here: Triana was an adult at the time; he did not appear to lack either the education or intelligence necessary to

10

understand Officer Mejia's explanation of the form; and Officer Mejia did not exhibit coercive behavior. See id. at 1241. In addition, Officer Mejia requested consent in a language Triana was fluent in, thereby removing any concerns as to whether Triana's "limited comprehension of English prevented him from providing voluntary [verbal] consent." Id. at 1242.

In light of these facts, the district court did not err when it determined that Triana freely and voluntarily gave verbal consent to the officers to search the vehicle. The court's decision to deny Triana's motion to suppress was therefore proper. See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (explaining the district court correctly denied the defendant's motion to suppress where record evidence indicated he "verbally consented to the search" and the "consent was voluntary").

## B.    BATSON VIOLATION

Triana next argues the government's decision to strike five African American jurors deprived him of a fair and impartial jury. See Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). This argument is without merit.

Batson established that when a "defendant makes a prima facie showing" of racially motivated preemptory strikes, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Id. at 97, 106 S. Ct. at 1723. Once the government has articulated a race-neutral reason for the

11

strike, the district court must weigh the evidence and credibility of the parties and "determine if the defendant has established purposeful discrimination." Id. at 98, 106 S. Ct. at 1724; see also Foster v. Chatman, 578 U.S. __, 136 S. Ct. 1737, 1747 (2016).  Because the "ultimate question of discriminatory intent represents a finding of fact," we review a district court's conclusion on this last Batson step for clear error.  Madison v. Comm'r, Ala. Dep't of Corr., 761 F.3d 1240, 1245, 1248 (11th Cir. 2014) (quoting Hernandez v. New York, 500 U.S. 352, 364, 111 S. Ct. 1859, 1868 (1991) (plurality opinion)).

The district court did not clearly err when it found the government's race-neutral reasons were "more than adequate to establish that [the peremptory strikes] were exercised appropriately and not for some unconstitutional purpose."  The government explained that it struck one juror because she said "she had such strong ill feelings towards the judicial system," and the government worried she would have a "presumption against the government."  The government struck a second juror because "she listed no prior jobs whatsoever for experience," and the government thought jurors without significant work experience would not "be the best type of juror for this case."  The government struck a third juror because she served on a criminal jury in federal court in a jurisdiction where the government

12

lost at least one case that year.[3]  A fourth juror was excluded because she indicated on her questionnaire "everyone should get another chance like [her] uncle's killer," and a fifth because the government thought she seemed "cavalier" about the proceedings.

Triana has not presented any evidence that the government's reasons were pretextual or otherwise not credible.  We therefore cannot say the district court clearly erred when it determined the government did not strike these jurors on the basis of race.[4]

## C.     JUDGMENT OF ACQUITTAL

Last, Triana contends the district court erred when it denied his motion for a judgment of acquittal.  Triana was charged with, and convicted of, violating 18 U.S.C. §§ 1029(a)(3), 1029(a)(4), and 1028A, each of which requires proof that a defendant have knowingly possessed the contraband at issue.  Triana argues there was insufficient evidence presented a trial to prove beyond a reasonable doubt that he knowingly and actually or constructively possessed the Walmart gift cards and

---

[3] This reason could be characterized as "irrational, silly, [and] superstitious." United States v. Hughes, 840 F.3d 1368, 1382 (11th Cir. 2016) (quotation marks omitted).  By this logic, a prosecutor can strike any juror who serves on a petit jury in any federal district court in the United States of America where the government has lost a case.  And yet, our precedent requires that we accept this explanation.  See id.

[4] To the extent Triana argues these reasons were not sufficiently neutral to pass Batson's second step, his argument is not supported by the law.  As we have said before, the government's stated reason "need not be a good reason"—only a non-discriminatory one.  Hughes, 840 F.3d at 1382 (quotation marks omitted).  Each of the five reasons proffered satisfies that minimal requirement.

skimming devices.  As a result, he argues the district court should have granted his motion for a judgment of acquittal on all counts.  This argument elides the evidence.

We review de novo a district court's decision to deny a motion for a judgment of acquittal on sufficiency of evidence grounds.  United States v. Capers, 708 F.3d 1286, 1296 (11th Cir. 2013).  As part of our review, we must "consider[] the evidence in the light most favorable to the Government, and draw[] all reasonable inferences and credibility choices in the Government's favor."  Id.  "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  Id. at 1297 (quotation marks omitted).

The government demonstrated at trial that Triana and Diaz shared an address and the vehicle was registered to Diaz at that same address.  The government also introduced testimony and evidence that officers found numerous items belonging to Triana in the vehicle, including two money orders Triana purchased to pay for the apartment he shared with Diaz more than a month before his arrest, a U-Haul receipt with Triana's name from almost three months earlier, and an envelope and letter addressed to Triana from T-Mobile dated five months before the traffic stop. A reasonable juror could infer from this that Triana and Diaz functionally shared ownership of the vehicle and regularly left or stored their possessions in the car,

14

including the duffle bag containing the devices and gift cards, which was found behind Triana's seat.

There was also evidence that Triana, who said he was unemployed, had a significant amount of money on his person and items indicating interest in larger purchases. A reasonable juror could infer that these were the products of card-skimming practices related to the duffle bag's contents, further establishing Triana's knowing possession of the contraband.[5] Taken together, the evidence was sufficient to show Triana had some form of control over the contraband in question, which qualifies as constructive possession. See United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006) ("Constructive possession exists when the defendant exercises . . . control over the item."). The district court therefore did not err when it denied his motion for a judgment of acquittal. See id. ("The government need not prove actual possession in order to establish knowing possession; it need only show constructive possession through direct or circumstantial evidence.").

**AFFIRMED.**

---

[5] To the extent Triana argues the government presented insufficient evidence that he "was a willful participant in the crime," this argument is similarly without merit. A reasonable juror could infer from the same evidence that Triana intended to use the contraband to defraud others.

15