[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14181

_____

D.C. Docket No. 6:14-cr-00077-RBD-KRS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRANDON LAVANTIS HUGHES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 4, 2016)

Before TJOFLAT, ROSENBAUM, and ANDERSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Time may wait for no one, but the Speedy Trial Act clock does.  Under the Speedy Trial Act of 1974, a federal criminal trial must commence within seventy days after a defendant is charged or makes an appearance in court, whichever occurs later.  18 U.S.C. § 3161(c)(1).  If it does not, the court must dismiss the indictment or information on motion by the defendant.  *Id.* § 3162(a)(2).  But significantly, the seventy-day Speedy Trial Act clock does not run continuously.  Instead, much like a timeout in a football game momentarily halts the game clock, some pretrial events temporarily stop the running of the Speedy Trial Act clock.

Defendant-Appellant Brandon Lavantis Hughes's appeal requires us to evaluate the effect on the Speedy Trial Act clock when a pretrial event that is not excludable under the Act occurs during the pendency of an event that is.  We find that the nonexcludable event does not affect the timeout from the Speedy Trial Act clock required by the excludable event and deny Hughes's challenge on this basis.  We likewise find no merit to Hughes's other arguments on appeal, so we affirm his conviction.

2

## I.  Background

### A.  The Underlying Offense

At 2:26 a.m. on November 25, 2011, the Seminole County Sheriff's Office received a 911 call from an anonymous person.  The caller reported that a man standing outside of a Sanford County bar called The Spot had "cock[ed]" a gun and "put it to a couple of people's heads."  According to the caller, the man had a "really big beard" and wore a black leather jacket, and his gun was long, silver, and western looking.  The caller identified the man as "Brandon Hill" and reported that Brandon went by the nickname "Baby."

The Sheriff's Office immediately transmitted the substance of the call to Sanford Police Sergeant Anthony E. Raimondo via its "Computer-Aided Dispatch" ("CAD") system.  Raimondo later testified that, when he received the dispatch, "[he] knew immediately that [the caller was] talking about Brandon *Hughes*" because he knew that Brandon Hughes went by the nickname "Baby" and "was standing in front of The Spot."  (emphasis added).

Already near The Spot, Raimondo arrived at the scene at 2:27 a.m.  He instantly recognized Hughes standing in front of the bar.  Hughes had a large bushy beard and was wearing a black jacket, but he was not wielding a gun or otherwise engaged in an altercation when Raimondo arrived.  So Raimondo parked and approached Hughes.

3

As Raimondo neared, Hughes momentarily disappeared from Raimondo's view, "fading back behind the southwest corner of . . . 'The Spot.'"  Almost immediately, Hughes reappeared.  When Raimondo greeted Hughes by name, Hughes, facing Raimondo, opened his jacket "like he was showing [Raimondo] something" and displayed his waistband, as though he were expecting Raimondo. Raimondo told Hughes that the Sheriff's Office "had a 911 call and that people were saying [Hughes] had a gun."  In response, Hughes invited Raimondo to check him.  Raimondo conducted a cursory search of Hughes's outer garments and waistline, looking for the gun.  But the search turned up empty.

While Raimondo was searching Hughes, Officer Geoff Field arrived on the scene.  Raimondo told Field that Hughes had consented to a search and asked Field to perform a more thorough examination.  In the meantime, Raimondo stepped around the corner of The Spot to inspect the location into which Hughes had temporarily ducked moments earlier.

Just around the corner, Raimondo located a garbage can.  The garbage can was in "exactly the same spot" where Hughes had disappeared.  Raimondo observed that the lid of the garbage can was slightly displaced.  So he peered inside and saw "a silver revolver, western-style handgun on top of the refuse" in the can. Raimondo retrieved the gun from the can.

4

Then Raimondo questioned Hughes about the gun. Hughes told Raimondo that "he didn't know anything about the gun, that it wasn't his gun, and . . . denied all knowledge of it." Raimondo and Field left without arresting Hughes.

Back at the Sanford Police station, the gun and the single bullet found inside it were stored as evidence. On November 29, 2011, the gun and bullet were transferred to the Volusia Sheriff's Office. Two weeks later, on December 13, 2011, Jonathan Mott, a Volusia County Sherriff's Office crime-scene investigator, processed the gun for fingerprints. Mott discovered two prints on the gun, photographed the prints, and provided the pictures to Cristal Bustamante, a Volusia County Sheriff's Office fingerprint technician.

On December 14, 2011, Bustamante ran the prints through law enforcement's Automated Fingerprint Identification System ("AFIS"). Though the system located no matches at that time, Bustamante again ran the revolver prints through AFIS almost a year-and-a-half later, on April 4, 2013. This time, the system identified "Brandon Lavantis Hughes" as a potential match.[1] Bustamante pulled the fingerprint cards on Hughes and conducted a side-by-side comparison of

---

[1] Neither party explains the delay between when Bustamante ran the prints through AFIS in 2011 and when she ran them through AFIS in 2013. Nor does the record reveal why the delay occurred or what prompted Bustamante to run the prints a second time, other than a brief reference to the fact that an investigator requested the analysis a second time.

them with the revolver prints.  She concluded that the revolver prints belonged to Hughes.  A second technician reached the same conclusion.

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") then took over the investigation.  On February 25, 2014, law-enforcement officers found Hughes on the back porch of Nixon Bar—formerly, The Spot, and they interviewed him.  Although Hughes admitted that his nickname was "Baby," he denied having any knowledge of the gun or any memory of the 2011 encounter with Raimondo, even after the officers told Hughes his prints had been found on the gun.

On April 2, 2014, a federal grand jury charged Hughes, a twice-convicted felon, with one count of knowingly possessing a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).[2]  Hughes was arrested the next day.

He appeared before a magistrate judge for his arraignment on April 4, 2014. The judge granted Hughes pretrial release on certain conditions, including that he

---

[2] Title 18 U.S.C. § 922(g)(1) reads as follows:

> (g)  It shall be unlawful for any person—
>
>> (1)   who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>> . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

refrain from using any narcotics, submit to drug testing, and abide by a curfew. The magistrate judge set trial for June 2, 2014.

## B. The Pretrial Motions

On April 21, 2014, pretrial services and the government filed a joint petition contending that Hughes had violated his conditions of pretrial release and seeking a warrant for his arrest. A magistrate judge issued the warrant later that day. Hughes self-surrendered on April 23, 2014.

The next day, a magistrate judge held an initial detention hearing. The government orally moved the court to detain Hughes pending trial. Hughes's attorney requested a continuance, and the magistrate judge granted the request, continuing the detention hearing to April 29, 2014. The magistrate judge did not make any factual findings or record any reasons for granting Hughes's request for a continuance.

On April 29, 2014, the magistrate judge held a final detention hearing and granted the government's motion. Subsequently, the district judge set trial for June 23, 2014.

On June 19, 2014, Hughes filed a motion to dismiss his indictment under the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.* In support of his motion, Hughes relied on § 3161(h)(7)(A), which makes the period of delay resulting from a court's granting of a continuance excludable under the Speedy Trial Act—but only

if the court "sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and defendant in a speedy trial." Noting that the magistrate judge had not made an ends-of-justice finding in support of his decision to grant Hughes's April 24, 2014, request for a continuance of the detention hearing, Hughes argued that the period between April 24, 2014, and April 29, 2014, continued to tick off the Speedy Trial Act clock. As a result, Hughes contended, the seventy-day Speedy Trial Act clock expired on June 13, 2014, and Hughes asked that his indictment be dismissed. The government opposed the motion.

The district court denied Hughes's motion and concluded that the Speedy Trial Act clock would expire on June 23, 2014—the day trial was scheduled to commence. Relevant to this appeal, the district court reasoned that the nine-day period between April 21, 2014—when pretrial services and the government filed their petition seeking a warrant for Hughes's arrest—and April 29, 2014, was excludable as pretrial-motion delay and as advisement delay under 28 U.S.C. § 3161(h)(1)(D), (H).[3] The district court rejected Hughes's argument that the six-

---

[3] In addition to pretrial-motion delay and continuance delay, the Speedy Trial Act provides that "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court" shall not be counted towards the seventy-day Speedy Trial clock. 18 U.S.C. § 3161(h)(1)(H).

day period from April 24 to 29 continued to count off the Speedy Trial Act clock under § 3161(h)(7)(A), holding that the period was automatically excludable as pretrial-motion delay. And even if a Speedy Trial Act violation had occurred, the district court opined, the appropriate remedy would have been dismissal without prejudice "because nothing about this particular case suggest[ed] that the Government sought to delay trial at all, much less in bad faith."[4]

## C. Jury Selection

During jury selection, the government struck Juror Number 3, the only African-American member of the venire. Hughes raised a *Batson* challenge to the government's strike. In response to the court's request for the government to provide a race-neutral reason for the strike, the government stated,

> Okay. Your Honor, with respect to [Juror Number 3], he does have a prior burglary conviction. I do note that some of the other jurors do have some prior contacts with law enforcement; but with respect to [Juror Number 3], it was a serious crime, a felony. And I also note that three years after the conviction, he was also violated for probation; but in addition to that, Your Honor, he did present some other issues.
>
> When the Court first opened up questions in terms of whether or not jurors had issues, it did appear as though he gave a number of reasons which were somewhat inconsistent. Originally he stated that because he's a car

---

[4] The Speedy Trial Act provides that a court should consider the following factors when determining whether to dismiss a case with or without prejudice: "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. § 3162(a)(2).

salesman, he needs to be present at his job in order to earn his salary, which is perfectly understandable, but then shortly thereafter he stated that there's some neurological issues that he's suffering from that he needs to address, which seemed to be somewhat inconsistent. So based upon that, the government does have some concerns about him.

The district court concluded that "the government . . . demonstrated sufficient nonrace-related reasons for the challenge exercised with respect to [Juror Number 3]" and overruled Hughes's *Batson* challenge.

## D. Evidentiary Objections at Trial

Hughes's trial began on June 23, 2014, and lasted two days. Before jury selection, the government informed the judge that it would seek to introduce a November 26, 2011, CAD report (the "CAD Report") as a business record.[5] Hughes objected, asserting that the report contained hearsay and violated his rights under the Confrontation Clause of the Sixth Amendment, since Hughes had no

---

[5] When the Seminole County Sheriff's Office receives a 911 call, the conversation is automatically recorded. The Sheriff Office's CAD system automatically gleans information about the call and pulls that data into the CAD system. In addition, as the call-taker starts interviewing the caller, the call-taker types information obtained from the caller directly into the CAD system, which records and relays the new information in real time. The CAD information is, at some point, fed to a "dispatcher" who dispatches a law-enforcement unit to the scene. The CAD information is relayed to the officers via the "My CAD system," and, even as the officers respond to the call, new information input into the CAD system by the original call-taker is relayed to the officers in real time. Besides facilitating 911 responses, as relevant here, the CAD system serves a recordkeeping function. The Sheriff's Office retains the data that is entered into the CAD system for each particular call "for up to 15 years"—far longer than the six months it keeps recordings of 911 calls—because the CAD data takes up less space on the Office's server. Printouts for any given call are called "CAD reports."

opportunity to cross-examine the anonymous 911 caller documented in the CAD Report.

The trial court overruled Hughes's objection. It determined that the CAD Report was admissible as an exception to the rule against hearsay, either as the 911 caller's present sense impression or as an ordinary business record of the law-enforcement agency.

At trial, the government offered the revolver and ammunition into evidence. Hughes objected on chain-of-custody grounds. Specifically, Hughes argued that "there was a gap in the chain-of-custody from the time that the firearm was transported to the Volusia County Sheriff's Office to the time the government introduced the firearm at trial." The district court eventually overruled the objection and admitted the firearm and ammunition into evidence.

### E.  The Jury Instructions

Following the close of the government's case, Hughes exercised his Fifth Amendment right to remain silent. He likewise declined to present witnesses. The district court conducted a charge conference, proposing to issue the following instruction regarding false exculpatory statements:

> You have heard testimony that the Defendant made certain statements outside the courtroom to law enforcement authorities in which the Defendant claimed that his conduct was consistent with innocence and not with guilt. The Government claims that these statements

11

in which the Defendant exonerated or exculpated himself are false.

If you find that the Defendant gave a false statement in order to divert suspicion from himself, you may, but are not required to, infer that the Defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the Defendant is, in fact, guilty of the crime for which he is charged.

Whether or not the evidence as to the Defendant's statements shows that the Defendant believed that he was guilty and the significance, if any, to be attached to such evidence are matters for you, the jury, to decide.

Hughes objected to the instruction, arguing that it was inappropriate in his case because he had merely denied knowledge of the firearm and had not misled law enforcement. The trial court overruled the objection and issued the instruction.

## F. The Appeal

At the close of deliberations, the jury returned a guilty verdict against Hughes, concluding that he had illegally possessed a firearm and ammunition in violation of the felon-in-possession statute, 18 U.S.C. § 922(g)(1). The district court sentenced Hughes to 57 months' imprisonment, to be followed by 2 years' supervised release.

Hughes now appeals on five grounds. First, Hughes argues that the district court erred in denying his motion to dismiss his indictment under the Speedy Trial Act. Second, Hughes contends that the district court wrongly overruled his *Batson* objection. Third, Hughes asserts that the district court should not have admitted

into evidence the CAD Report and the firearm and ammunition.  Fourth, Hughes challenges the instruction of the jury on false exculpatory statements.  Finally, Hughes argues, "for purposes of preservation," that the felon-in-possession statute, 18 U.S.C. § 922(g), is unconstitutional, facially and as applied.

## II.  Discussion

### A.  The Speedy Trial Act Claim

As we have noted, the Speedy Trial Act mandates that a criminal defendant's trial commence within seventy days "from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."  18 U.S.C. § 3161(c)(1).  When the clock is triggered by a defendant's first appearance, the clock begins to run on the day after the defendant's appearance.  *See United States v. Williams*, 314 F.3d 552, 557 (11th Cir. 2002).  If trial does not begin within seventy days, the defendant's "information or indictment shall be dismissed on motion of the defendant."  *Id.* § 3162(a)(2).

But the Act enumerates certain periods of delay that do not count towards the seventy-day time limit.  *See id.* § 3161(h).  In this case, we need consider only whether the district court's determination that the period between April 24 and 29

13

was excludable under the Act was correct.[6]  If so, trial commenced within the statutory period, and the district court properly denied Hughes's motion to dismiss. But if the district court erred in excluding that six-day period, the Speedy Trial Act clock expired in this case before trial began, and the case should have been dismissed.

We review *de novo* a district court's decision denying a defendant's Speedy Trial Act motion, though we review for clear error the court's factual determinations on excludable time.  *United States v. Mathurin*, 690 F.3d 1236, 1239 (11th Cir. 2012).

We find that the period from April 24 to 29 is excludable under the Speedy Trial Act.[7]  Specifically, this period constitutes excludable pretrial-motion delay triggered by the government's oral motion for Hughes's detention.  Under 18 U.S.C. § 3161(h)(1)(D), the filing of a pretrial motion stops the Speedy Trial clock

---

[6] Hughes has abandoned his position in the district court that the Speedy Trial Act clock expired on June 13.  He currently asserts that the clock ran out on June 18.  As a result, the differences in the Speedy Trial Act calculations of Hughes, the government, and the district court, which vary in respects other than those regarding the April 24-29 period, do not affect the determination of whether a violation of the Act occurred.

[7] The trial court excluded the period from April 24-29 as part of a larger exclusion of the period from April 21-29, 2014.  As the Government concedes, though, the period from April 22-23 was not excludable.  On April 21, the government and pretrial services filed a petition seeking Hughes's arrest for violating his pretrial release conditions, but the court granted the petition that day.  So the petition for Hughes's arrest stopped the Speedy Trial Act clock for pretrial motion delay and advisement delay for that day only, and the clock began to run again the next day.  *See* 18 U.S.C. § 3161(h)(1)(D), (H).  As a result, April 22-23 should not have been excluded.  This error, however, is not enough without the addition of the April 24-29 period to render the commencement of Hughes's trial untimely under the Speedy Trial Act.

until "the conclusion of the hearing on, or other prompt disposition of, such motion." *Id.* Nor does the oral nature of the motion affect the rule's applicability. Indeed, we have specifically held that "oral pretrial motions made on the record" trigger pretrial-motion delay under the Act. *United States v. Broadwater*, 151 F.3d 1359, 1361 (11th Cir. 1998).[8]

And for motions that require hearings, excludable pretrial-motion delay encompasses "all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is reasonably necessary." *Henderson v. United States*, 476 U.S. 321, 330, 106 S. Ct. 1871, 1877 (1986) (internal quotation marks omitted). Excludable pretrial-motion delay for motions that require hearings also encompasses the "time after a hearing on a motion but before the district court receives all the submissions by counsel it needs to decide that motion." *Id.* The excludable period of delay ceases when the court has held the hearing and received all the submissions it reasonably expects; at that point, the motion is "under advisement," and only 30 days thereafter may be excluded as advisement delay under 18 U.S.C. § 3161(h)(1)(H). *See id.* at 328-30; 106 S. Ct. at 1876-77.

---

[8] In *Broadwater*, we held that "oral pretrial motions made on the record" triggered pretrial motion delay under 18 U.S.C. § 3161(h)(1)(F). *Id.* at 1366. When *Broadwater* was decided, § 3161(h)(1)(F) provided that "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" did not count towards the seventy-day clock. 18 U.S.C. § 3161(h)(1)(F) (1994). That language has been moved to subsection (h)(1)(D). *See* 18 U.S.C. § 3161(h)(1)(D) (2012).

15

Here, the government orally moved for Hughes's detention at the April 24 hearing. The attorney representing Hughes requested that the hearing be continued so that Hughes's primary counsel could "look into some of the allegations to see if there [was] a defense to any of the allegations or an explanation." The magistrate judge granted the continuance without making any findings.[9]  And, on April 29, 2014, the magistrate judge held a hearing on the government's motion for detention and granted it.

Under a straightforward reading of § 3161(h)(1)(D), then, the period from April 24 to 29 constitutes automatically excludable pretrial-motion delay. The government's oral motion triggered excludable pretrial-motion delay, and April 29 marked the conclusion of the excludable period of delay for three independent reasons: (1) the trial court "prompt[ly] dispos[ed] of" the government's motion on that day, 18 U.S.C. § 3161(h)(1)(D);  (2) the conclusion of the April 29 hearing was the true "conclusion of the hearing" on the government's motion, *Henderson*, 476 U.S. at 330, 106 S. Ct. at 1877; and (3) April 29 marked the point when "the district court receive[d] all the submissions by counsel it need[ed] to decide that motion" because the trial court continued the detention hearing to April 29 to permit Hughes's primary counsel to contest the government's motion, *id.*

---

[9] Title 18, United States Code, § 3142(f)(2) provides that the court may continue a detention hearing for a period of up to five business days upon, among other occurrences, a motion by a defendant to do so. Nothing in that provision requires the court to state, or even to have, any reasons for granting the continuance unless the court grants a continuance that lasts longer than five business days. In that case, "good cause" must exist. *See id.*

We are not persuaded by Hughes's argument to the contrary. Hughes contends that the period from April 24 to 29 is not excludable under the Act because he moved for a continuance of the detention hearing on April 24, and the court made no finding before granting the continuance through April 29 that the ends of justice outweigh the best interests of the public and the defendant in a speedy trial. In support of his position, Hughes relies on 18 U.S.C. § 3161(h)(7)(A) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196, 130 S. Ct. 1345 (2010).

Section 3161(h)(7)(A) specifies that "delay resulting from a continuance granted by any judge" is excludable delay "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." But simply making such a finding does not satisfy the provision. Rather, § 3161(h)(7)(A) continues, "No such period of delay resulting from a continuance granted by the court . . . shall be excludable under this subsection unless the court sets forth, in the record of the case . . . its reasons" underlying its ends-of-justice findings. *Id.* Hughes contends that the magistrate judge's failure to make an ends-of-justice finding supported by on-the-record reasons renders the April 24-29 period non-excludable continuance delay.

We disagree. First, the text of the continuance provision on which Hughes relies belies his argument. As a general matter, § 3161(h)(7)(A) does not purport to trump the other paragraphs in § 3161(h). So where, as here, a period of delay arguably stems both from a continuance and from a pretrial motion, nothing in § 3161(h)(7)(A) indicates that that section supersedes § 3161(h)(1)(D) and renders non-excludable the otherwise-excludable pretrial-motion delay.

Second, nothing in *Bloate* alters our conclusion that § 3161(h)(7)(A) does not trump § 3161(h)(1)(D). In *Bloate*, the Supreme Court held that delay resulting from a district court's order granting parties time to prepare and file pretrial motions is not automatically excludable pretrial-motion delay. *Bloate*, 599 U.S. at 203-207, 130 S. Ct. at 1351-54. Instead, only the actual filing of a pretrial motion triggers automatic pretrial-motion Speedy Trial Act clock stoppage. *Id.* at 206, 130 S. Ct. at 1353. Hughes's case, however, involves the actual filing of a pretrial motion in the form of the government's oral motion for detention. So *Bloate* is simply inapplicable.

Third, adopting Hughes's construction of the Speedy Trial Act would superimpose a causation requirement over the Act's delay provisions that the Supreme Court has already rejected as unworkable. Where delay "result[s] from" the filing of a pretrial motion, it is to be excluded from the Speedy Trial Act's seventy-day clock. 18 U.S.C. § 3161(h)(1)(D). Here, the delay may reasonably be

18

viewed as "resulting from" either the government's oral pretrial motion or from Hughes's request for a continuance.  Under Hughes's interpretation, the district court would have to engage in a proximate-cause analysis to determine whether the delay "resulted from" the pretrial motion or the continuance in order to determine whether it was ultimately excludable.

But the Supreme Court rejected that very approach in *United States v. Tinklenberg*, 563 U.S. 647, 131 S. Ct. 2007 (2011).  There, the Court held that § 3161(h)(1)(D) contains no causation requirement and that Congress did not intend for judges to determine whether a delay was "actually cause[d]" by a pretrial motion.  *Tinklenberg*, 563 U.S. at __; 131 S. Ct. at 2010-11, 2013.  Instead, the Court held that § 3161(h)(1)(D) "stops the Speedy Trial clock from running *automatically* upon the filing of a pretrial motion irrespective of whether the motion has any impact on when the trial begins."  *Id.* at __, 131 S. Ct. at 2012 (emphasis added).  Notably, the Court rejected the imposition of a causation requirement, in part, to avoid the causal dilemma courts would face under Hughes's interpretation—namely, what to do when a period of delay arguably results from excludable and nonexcludable causes:

> Moreover, what is to happen if several excludable and several nonexcludable potential causes of delay (e.g., pre-trial motions to take depositions, potential scheduling conflicts, various health examinations, etc.) coincide, particularly in multidefendant cases?  Can the judge, motion by motion, decide which motions were

19

> responsible and which were not responsible for postponing what otherwise might have been an earlier trial date?  And how is a defendant or his attorney to predict whether or when a judge will later find a particular motion to have caused a postponement of trial?  And if the matter is difficult to predict, how is the attorney to know when or whether he or she should seek further postponement of the 70–day deadline?

*Id.* at __; 131 S. Ct. at 2015.  To sidestep that problem, the Supreme Court rejected a causal requirement under § 3161(h)(1)(D) in favor of an eminently more workable rule: the filing of a pretrial motion automatically stops the Speedy Trial clock until its resolution, regardless of whether it "actually causes" any delay.

We therefore reject Hughes's contention that the magistrate judge's failure to make an on-the-record, ends-of-justice finding rendered the April 24-29 period non-excludable.  Instead, the government's oral motion at the April 24 hearing automatically stopped the Speedy Trial clock until the court disposed of that motion on April 29.  So Hughes's trial timely commenced on the seventieth day after his first appearance, *see* 18 U.S.C. § 3161(c)(1), and we affirm the trial court's denial of Hughes's Speedy Trial Act motion.

## B.  The *Batson* Claim

Hughes argues that the trial court clearly erred in denying his *Batson* challenge to the government's use of one of its peremptory challenges to strike Juror Number 3, the only African-American in the venire.  In general, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on

20

account of their race." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1717 (1986). Even a single peremptory strike that results from discriminatory intent violates the Equal Protection Clause. *See Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir. 1995).

When a party accuses her opponent of violating *Batson*'s prohibition, a district court deploys a three-step process to adjudicate the claim:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, __ U.S. __, 136 S. Ct. 1737, 1747 (2016). We review a district court's denial of a *Batson* challenge for "clear error," *United States v. Blackman*, 66 F.3d 1572, 1575 (11th Cir. 1995), according the district court's "determination on the ultimate question of discriminatory intent . . . great deference on appeal," *Greene v. Upton*, 644 F.3d 1145, 1155 (11th Cir. 2011) (internal quotation marks omitted).

Here, the trial court apparently rejected Hughes's *Batson* challenge at step 3.[10]  On appeal, however, Hughes challenges the trial court's decisions at *Batson* steps 2 and 3.

Regarding step 2, Hughes argues that the government failed to provide legitimate, race-neutral reasons for striking Juror Number 3.   We do not agree.

"The reason given for the peremptory strike need not be a good reason," and it can even be an "irrational, silly or superstitious reason, as long as it is not a discriminatory reason*." United States v. Steele*, 178 F.3d 1230, 1235 (11th Cir. 1999).  Here, the government explained that it struck Juror Number 3 because that juror had committed a felony and had violated the terms of his resultant probation. In addition, the government stated that it struck Juror Number 3 because he gave inconsistent answers during *voir dire*.  Even if these could fairly be viewed as "irrational" or "silly" reasons, they were not facially discriminatory reasons. Therefore, we affirm the trial court's decision at *Batson* step 2.

As for *Batson* step 3, Hughes argues that other jurors had contacts with law enforcement but were not excluded; that the government failed to explain why Juror Number 3's burglary conviction rendered him unfit for jury duty; that Juror Number 3's inconsistent *voir dire* answers were not grounds to exclude him; and

---

[10] Though the district court did not explicitly rule on *Batson* step 1, we interpret its request for race-neutral reasons from the government as an implicit ruling that Hughes met *Batson* step 1. *See United States v. Campa*, 529 F.3d 980, 998 (11th Cir. 2008) (construing the district court's decision to require the government to give race-neutral explanations for its peremptory challenges as an implicit decision that *Batson* step 1 was met).

22

that the government's proffered reasons did not rebut Hughes's *prima facie* case. We have a different view.

At *Batson* step 3, **"**the district court's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding, and we will reverse only if the decision is clearly erroneous." *United States v. Walker*, 490 F.3d 1282, 1291 (11th Cir. 2007). "A district court's perception of an attorney's credibility is an essential part of determining whether a proffered reason was pretextual." *Id.* at 1293-94. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Madison v. Comm'r, Alabama Dep't of Corr.*, 761 F.3d 1240, 1251 (11th Cir. 2014) *cert. denied sub nom. Madison v. Thomas*, __ U.S. __, 135 S. Ct. 1562 (2015) *reh'g denied*, __ U.S. __, 135 S. Ct. 2346 (2015). Of course, a court may find intent to discriminate when the reason provided for striking a juror applies with equal force to a juror that the same party declined to strike, who is outside the protected group of the stricken juror. *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009). But we do not view a party's failure to strike "similarly situated jurors" as pretextual when "relevant differences" exist between the juror who was stricken and jurors who were not. *Id.*

23

Here, striking Juror Number 3 for his criminal background in a criminal case could well have been a race-neutral, reasonable trial strategy. *See United States v. Crawford*, 413 F.3d 873, 875 (8th Cir. 2005) ("A prior conviction is a race-neutral reason for dismissing a juror.").  And the fact that Juror Number 3 violated probation, resulting in repeated contact with law enforcement and the courts, distinguishes him from Hughes's proffered comparator jurors and supports the government's contention that it struck Juror Number 3 out of a concern over his prior contact with law enforcement.  "The trial judge's decision on [the] ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal," *United States v. Folk*, 754 F.3d 905, 914 (11th Cir. 2014) (internal quotation marks and alterations omitted) *cert. denied*, __ U.S. __, 135 S. Ct. 1006 (2015).  On this record, we can find no clear error in the district court's factual determination that the government did not strike Juror Number 3 for discriminatory reasons.

## C.  The Evidentiary Objections

Hughes argues that the district court erred in admitting into evidence (1) the firearm and ammunition and (2) the CAD Report.  We are not persuaded.

In general, we review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006).  However, "[w]e review *de novo* the question of whether hearsay statements are

24

'testimonial' for purposes of the Confrontation Clause." *United States v. Lamons*, 532 F.3d 1251, 1261 n.15 (11th Cir. 2008).

With regard to the firearm and ammunition, Hughes asserts that the district court should have precluded their admission because of "cumulative gaps in the chain-of-custody." However, gaps in the chain of custody bear on only the weight of the evidence, not its admissibility. *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990). As a result, Hughes's challenge on this basis fails. *See United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir. 1985), *cert. denied*, 474 U.S. 1054, 106 S. Ct. 789 (1986).

As for the CAD Report, Hughes argues that the district court abused its discretion in admitting it into evidence because it contained "testimonial" statements by the 911 caller in violation of Hughes's rights under the Confrontation Clause. The Sixth Amendment's Confrontation Clause guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court held that the Confrontation Clause prohibits the introduction of "[t]estimonial statements of witnesses absent from trial" unless "the declarant is unavailable, and . . . the defendant has had a prior opportunity to cross-examine" the witness. *Id.* at 59, 124 S. Ct. at 1369. The admission of an absent witness's

*nontestimonial* statements, on the other hand, does not run afoul of the Confrontation Clause. *Id.* at 68, 124 S. Ct. at 1374.

In *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266 (2006), the Supreme Court elaborated on the differences between nontestimonial and testimonial statements to the police.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution

*Id.* at 822, 126 S. Ct. at 2273-74. In *Davis*, for instance, the Supreme Court held that a 911 caller's statements to a 911 operator were nontestimonial for several reasons: (1) "the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance"; (2) the caller was "speaking about events as they were actually happening, rather than describing past events"; (3) a 911 caller is usually facing an "ongoing emergency"; and (4) the statements elicited by the operator "were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what . . . happened in the past." *Id.* at 827, 126 S. Ct. at 2276 (emphasis in original). From these attributes, the Supreme

Court "conclude[d] . . . that the circumstances of [the 911 call] objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency. [The caller] simply was not acting as a *witness*; she was not *testifying*." *Id.* at 828, 126 S. Ct. at 2277 (emphasis in original). So the Court held that the statements at issue in *Davis* were nontestimonial and properly admitted. *Id.*

Here, for exactly the same reasons, the 911 caller's statements contained in the CAD Report were nontestimonial. Even Hughes acknowledges that, "[a]dmittedly, the testimony at trial established that the primary purpose of a CAD report ordinarily is 'to provide information to the officers who are responding in the field in realtime to allow them to address whatever ongoing emergency is being reported.'" Nor does Hughes contend that the CAD Report in his case is unique, or that the 911 caller's statements themselves were somehow unrelated to the CAD Report's primary purpose of assisting officers who were responding to an ongoing emergency. Put simply, Hughes fails to distinguish the 911 caller's statements in this case from those in *Davis* in any way whatsoever.

For these reasons, we hold that the trial court did not err in admitting either the firearm and ammunition or the CAD Report.

27

### D. False-Exculpatory-Statements Jury Instruction

Next, Hughes argues that the district court committed reversible error by issuing a false exculpatory statements jury instruction. We generally review jury instructions challenged in the district court *de novo* in order "to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012). But where, as here, a party raises an argument regarding jury instructions for the first time on appeal, we review the district court's issuance of that instruction for plain error. *United States v. Solomon*, 856 F.2d 1572, 1577 (11th Cir. 1988).

At trial, Hughes objected to the false-exculpatory-statements instruction on the grounds that he had merely denied knowledge of the firearm and had not misled law enforcement, so it was inappropriate to give the challenged instruction in his case. For the first time on appeal, however, Hughes contends that "there [was] no basis under this Court's precedent to instruct the jury to draw negative inferences from his purported false exculpatory statements" because he invoked his Fifth Amendment right against self-incrimination and chose not to testify. He bases his argument on *United States v. Brown*, 53 F.3d 312 (11th Cir. 2005), which he characterizes as holding that "only" a defendant who testifies runs a substantial risk of bolstering the Government's case. Because Hughes did not raise the argument he now presses on appeal at trial, we review for plain error.

28

To establish plain error, "a defendant must show there is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Evans*, 478 F.3d 1332, 1338 (11th Cir. 2007). Only if all three requirements are satisfied may we exercise our discretion to recognize a forfeited error, but we may do so "only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.*

Hughes fails to meet the error prong of the plain-error test. Contrary to Hughes's assertion, we did not hold in *Brown* that "only" a defendant who testifies may have his false exculpatory statements held against him. In fact, despite Hughes's quotation of the word "only" in his citation to *Brown*, that word does not even appear in the language that Hughes relies on from *Brown*. Instead, in *Brown*, we merely observed that defendants are not obliged to take the stand and that those who do run the risk of bolstering the government's case. 53 F.3d at 314.

We have, however, held that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. McDowell*, 250 F.3d 1354, 1367 (11th Cir. 2001). And this principle applies equally to false exculpatory statements made pre-trial and false exculpatory statements made on the stand. *See id.*; *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997) ("The jury could also properly consider appellant's false exculpatory statements upon his arrest as substantive evidence of

his guilty intent."). So we find no merit to Hughes's argument that the jury could not consider his pre-trial, false-exculpatory statements as substantive evidence of his guilt because he chose not to take the stand.

### E. Hughes's Constitutional Challenge

Hughes's final argument on appeal is that 18 U.S.C. § 922(g)—the statute under which he was convicted—is unconstitutional, facially and as applied, in two respects. First, Hughes argues that the felon-in-possession statute is unconstitutional because it fails to limit commerce to "interstate commerce." Second, Hughes argues that the statute is unconstitutional because Congress exceeded its power under the Commerce Clause in enacting the statute.

We generally review the constitutionality of a statute *de novo*. *United States v. Cespedes*, 151 F.3d 1329, 1331 (11th Cir. 1998). But where, as here, a party raises a constitutional challenge for the first time on appeal, our review is limited to "plain error." *United States v. Peters*, 403 F.3d 1263, 1270 (11th Cir. 2005).

In this case, however, as Hughes acknowledges, we have previously rejected both of his arguments and are bound by those decisions. *See United States v. Nichols*, 124 F.3d 1265, 1266 (11th Cir. 1997); *United States v. McAllister*, 77 F.3d 387, 389 (11th Cir. 1996). As a result, we do not overturn Hughes's conviction on this basis.

# III.  CONCLUSION

For the reasons stated above, we affirm Hughes's conviction.

**AFFIRMED.**