[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15034
Non-Argument Calendar

_____

D.C. Docket No. 1:14-cr-20118-UU-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDDY LEE PARKS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 30, 2017)

Before MARTIN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Freddy Lee Parks was convicted of four counts of Hobbs

Act robbery, in violation of 18 U.S.C. § 1951(a), and three counts of brandishing a

firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Parks was convicted of a string of armed robberies in Miami-Dade County, Florida. On appeal, Parks argues that the district court violated his Sixth Amendment rights to confrontation and to present evidence in his defense by precluding him from questioning detectives about a cooperating co-defendant's post-arrest statements and related matters. Because we conclude that the district court did not violate Parks's constitutional rights, we affirm.

## I.

On the morning of February 3, 2014, Parks and Devin Washington entered The Check Cashing Store in Miami through a hole that had been cut in the roof of the store. When a store manager arrived for work, Parks and Washington forced her at gunpoint to open the store's safe. According to the manager's trial testimony, one of the robbers (Parks) was holding a firearm wrapped in a plastic bag, while the other robber (Washington) was holding a black firearm. The manager entered the code to the safe, which was set on a 30-minute time delay.

Police arrived while Parks and Washington waited for the safe to open. Seeing the police, the robbers stole $216 from the manager's purse and then fled the store through the roof. Police chased and eventually apprehended Parks and Washington. In a search of a surrounding area, police recovered one of the

firearms used in the robbery: a silver and black, Desert Eagle semi-automatic handgun.

In a post-arrest interview that same day, Parks confessed to the robbery at The Check Cashing Store. Parks was also interviewed separately about three other robberies—at a Sunoco gas station, an M&M Market, and a McDonald's—which had occurred during the previous two weeks. Parks confessed to these robberies as well.

After a federal grand jury returned an indictment against Parks and Washington, Washington pled guilty and began cooperating with the government. Parks proceeded to trial by jury.

At trial, the government presented evidence that, on four separate dates in early 2014, Parks committed robberies, usually while armed, in the Miami area. This evidence consisted of eye-witness testimony, some surveillance footage, and Parks's confessions to the robberies. Detective Robert Gonzalez testified about his interview with Parks about the Check Cashing Store robbery, and Detective Safi Mohammed testified about his interview with Parks about the robberies at Sunoco, M&M, and McDonald's. The jury also heard audio recordings of Parks's confessions.

According to Gonzalez, Parks admitted to his role in the Check Cashing Store robbery, but he claimed that the weapon he used, which he had wrapped in a

plastic shopping bag, was an airsoft BB gun, not a genuine firearm. Police did not find an airsoft BB gun. On cross-examination, defense counsel asked Gonzalez whether Washington, Parks's co-defendant, had claimed the Desert Eagle handgun was his and whether officers had determined that the Desert Eagle was not Parks's. The government successfully objected to both questions on hearsay grounds.

Washington testified for the government about his role in the Check Cashing Store robbery. During the robbery, according to Washington, he had an all-black firearm, while Parks had a silver and black firearm with a bag over it. Washington identified the Desert Eagle handgun in evidence as the one Parks used during the robbery. Washington denied telling police that he used a silver and black firearm during the robbery, though he admitted to possessing the firearm briefly in flight from the robbery when Parks tried to hand the weapon off to him.

After Washington left the stand, defense counsel raised the issue that is the subject of this appeal. Defense counsel identified a discrepancy between Washington's trial testimony and a statement in the affidavit accompanying the criminal complaint. The affidavit, prepared by Detective Wayne Peart, stated that Washington had identified the Desert Eagle handgun "as the firearm that he had used during the attempted robbery at The Check Cashing Store." Based on that discrepancy, defense counsel asked to call Peart, or whoever had heard the statement from Washington, as a witness. The government stated that Detectives

4

Gonzalez and Acosta, not Peart, conducted the interview with Washington. The district court directed the government get Gonzalez and Acosta to the courthouse.

Thereafter, the government rested its case-in-chief, and the district court denied Parks's motion for judgment of acquittal. Since Gonzalez and Acosta had not yet arrived, the court directed defense counsel to proceed with Parks, who intended to testify in his defense. After a short recess, the court questioned defense counsel about the purpose of calling Gonzalez and Acosta as witnesses. The following colloquy took place.

> THE COURT: Well, what I'm trying to ask you is, what if Mr. Johnson or Ms. Telfair[1] spoke to these officers rather than making them come down here, ascertain whether either one of them acknowledged having told Detective Peart this? Because why are we making them come here if both of them or one of them would say I never told Detective Peart that?
>
> MR. DONET[2]: I guess it would be important to know what they were going to say. If they were going to say—
>
> THE COURT: Well, that's why I'm asking you. Perhaps we should get one of these lawyers on the phone to speak to them.
>
> MR. DONET: Judge, and I'm all for expediting everything.
>
> THE COURT: No, that's not really my point. My point is why are we dragging them. I have no idea what they would say. All we know is that Detective Peart asked them to come here and they were working the midnight shift.
>
> MR. DONET: Yes, Your Honor.

---

[1] Johnson and Telfir were Assistant United States Attorneys.

[2] Donet was defense counsel.

THE COURT:  Neither one of these lawyers have spoken to them about this issue.  So, do you think it might be worthwhile to have either Ms. Telfair or Mr. Johnson call these people and see what it is they have to say about whether or not they communicated this information to Detective Peart?

MR. DONET:  Yes, ma'am.  I believe there's two questions.  The first question is did Mr. Washington make the statement—did Mr. Washington recognize the Desert Eagle as the firearm that he used during the robbery; and if the answer is yes, then, I guess, unless the Government would allow Detective Peart to testify to that, I would want one of those two officers here to say no, Washington told me that he used that firearm.

THE COURT:  Okay.

MR. DONET:  If they say he never made that statement, then I believe the second inquiry should be where was the miscommunication.  Was it that they told Detective Peart the wrong information or did they tell Detective Peart the correct information and he wrote it down wrong?  Because if there is an error—

THE COURT:  Well, Detective Peart is not really a witness to anything in the case.  All he did was he drafted the criminal complaint, right, Mr. Johnson?

MR. JOHNSON:  Yes, Your Honor.

THE COURT:  So he's not really a witness in the case.  There's no basis for impeaching Detective Peart.  I can't think of a reason to impeach Detective Peart based on hearsay.  So, you know, I don't know where we're going with this.  But I do think it might be a good idea for one of these two lawyers to speak to these individuals as they're getting dressed and traveling here, so that if we can abort their transportation here after discussing it, we can do so.

MR. DONET:  I have no objection to that, Your Honor.

6

Parks then took the stand to testify in his defense. He testified that he participated in the Check Cashing Store robbery but did not carry a firearm. Instead, he held his hand inside a plastic bag in such a way as to make it look like a gun. He identified the Desert Eagle handgun in evidence as Washington's.

Parks further claimed that his confessions had been procured through coercion and manipulation.[3] According to Parks, until he confessed, the detectives denied him food, access to a bathroom, and medical attention for the dog-bite injuries he sustained during his arrest. Parks said that he was in pain and gave in to the detectives' demand to confess, believing that the interrogation was being recorded and would show the truth of the encounter. Parks further testified that he was coached about the details of the other robberies and that the detectives recorded him only when he complied with their instructions. Parks claimed he was not taken to a hospital until 3:45 a.m., after being interrogated all day.

After Parks testified, the district court, outside the presence of the jury, asked whether the government had been able to reach Gonzalez and Acosta. The government said that it had and then gave the following proffer of the detectives' testimony:

> When asking them—at first, if they would testify that Washington told them that he possessed the silver and black firearm during the robbery, they said no. They were consistent. Both of them said that he possessed the silver and black firearm as they were leaving and he

---

[3] Parks did not move to suppress his confessions before trial.

7

obtained that firearm from Freddy Parks.  In asking them how is it that Detective Peart got it wrong, they did not know.  They said you could argue from their perspective that he had possession of it during the robbery because they were fleeing.  But they never said that he had possession during the robbery.

In response, defense counsel indicated that he would like to question Peart about what he was told by Gonzalez and Acosta.  The court responded, "No.  He's not a witness in the case.  There's no reason to impeach him, and he has no personal knowledge, as I understand it.  He was not in on the interviews.  Is that right?  He has no personal knowledge of this case."  Defense counsel replied that Peart had personal knowledge of the case, just not of Washington's interview, and counsel continued to insist on questioning Peart.  The following exchange ensued:

> MR. DONET:  What if Detective Peart were to testify that one of those detectives, either Gonzalez or Acosta, told him that Mr. Washington identified the firearm as one he used during the robbery?
>
> THE COURT:  I don't even know that you could use that for impeachment.  But could you please ask Detective Peart that, Ms. Telfair?
>
> MS. TELFAIR:  Sure.
>
> THE COURT:  But I think he already told us he did not recall who he had heard it from.
>
> MS. TELFAIR:  No, Your Honor.  The answer to that is no, no one told him specifically that Devon Washington had a firearm, silver and black, during the robbery.
>
> MR. DONET:  I would like to somehow get that on the record and if I could get it in front of the jury.  I don't know how—

8

THE COURT:  Well, I don't know how you would do that.  So that's the end of it as far as I'm concerned.  So what else do you have for us?

MR. DONET:  That's it, Your Honor.  We would rest.

In rebuttal, the government again called Detective Mohammed, who was present for Parks's confessions to the robberies at Sunoco, M&M, and McDonald's.  Mohammed rebutted Parks's allegations of coercion.  At the close of all evidence, the court denied Parks's motion for judgment of acquittal.

Following closing arguments, the district court gave the jury instructions, including an instruction on an aiding-and-abetting theory of liability.  Ultimately, the jury returned a verdict finding Parks guilty on all counts.  The district court sentenced him to a total term of imprisonment of 684 months and one day.[4]  Parks now brings this appeal.

## II.

Generally, we review a district court's evidentiary rulings for a clear abuse of discretion.  *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007).  But if the exclusion of evidence potentially violated a constitutional guarantee, we

---

[4] The parties agreed at sentencing that this was the minimum sentence that could lawfully have been imposed by statute, due to the requirement that the three brandishing sentences, two of which had to be "not less than 25 years," run consecutively to each other and to any other sentence.  *See* 18 U.S.C. § 924(c)(1)(D)(ii) ("[N]o term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.").

review *de novo*.  *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009).

Where a party raises a constitutional or evidentiary challenge for the first time on appeal, our review is limited to "plain error."  *United States v. Hughes*, 840 F.3d 1368, 1385 (11th Cir. 2016); *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).  "To establish plain error, a defendant must show there is (1) error, (2) that is plain, and (3) that affects substantial rights."  *Hughes*, 840 F.3d at 1384.  If these three prongs are met, we may exercise our discretion to correct the error so long as the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.* at 1384–85.

## III.

On appeal, Parks broadly claims that the district court's refusal to let defense counsel question Detectives Peart, Gonzalez, or Acosta violated his Sixth Amendment right to present a complete defense.  Parks contends that the court prevented him from effectively challenging the credibility of government witnesses and from bolstering the credibility of his own testimony.  As a result, Parks asserts, the court deprived the jury of his version of events and of all evidence necessary "to be able to get to the truth."

Under the Fifth and Sixth Amendments, a criminal defendant has the right to present evidence in his defense.  *United States v. Hurn*, 368 F.3d 1359, 1362 (11th

Cir. 2004).  Nevertheless, "this right is not unbounded.  Thus, '[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'"  *United States v. Frazier*, 387 F.3d 1244, 1271 (11th Cir. 2004) (*en banc*) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).

We employ a two-step analysis when a defendant claims a violation of his Fifth and Sixth Amendments right to call witnesses in his defense.  *Hurn*, 368 F.3d at 1362.  The first step of the analysis is whether the right to call defensive witnesses was actually violated.  *Id.*  In general, the defendant must be permitted to introduce evidence that, directly or indirectly, pertains to the elements of a charged offense or an affirmative defense, evidence that could substantially impact witness credibility, and evidence that "tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently."  *Id.* at 1363.  Nevertheless, the district court may properly exclude evidence where the link between evidence and the legally relevant point "is simply too attenuated."  *See id.* at 1366.

If the defendant's right to call witnesses was actually violated, we then examine whether the error was "harmless beyond a reasonable doubt" under *Chapman v. California*, 386 U.S. 18 (1967).  *Id.* at 1362–63.  Under *Chapman*, the beneficiary of a constitutional error has the burden of proving "beyond a

11

reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24.

As detailed in the fact section above, Parks's appeal is based on an apparent contradiction between Washington's trial testimony and a statement attributed to Washington in an affidavit in support of the criminal complaint. In the affidavit, Detective Peart wrote that Washington had identified the Desert Eagle handgun recovered by police "as the firearm that he had used during the attempted robbery at The Check Cashing Store." At trial, Washington denied making this statement and said the firearm was Parks's. Based on this inconsistency, Parks sought to call Detectives Peart, Gonzalez, and Acosta as witnesses. After an extensive discussion, the court did not permit counsel to question the detectives.

Parks appears to argue that the district court wrongfully excluded the detectives' testimony under one of the four theories identified in *Hurn*. Specifically, he contends that the excluded testimony was critical to the jury's assessment of various witnesses' credibility, including his own. *See Hurn*, 368 F.3d at 1366. But he concedes that the excluded evidence was not directly or indirectly relevant to the elements of an offense or affirmative defense, *see id.* at 1363–64, admitting that, "as far as [the February 3] robbery, . . . whether he had a real gun or not is irrelevant to his conviction of it based on 18 USCS § 2, which makes him liable for Mr. Washington's use of a firearm during this robbery."

Appellant's Reply Br. at 11.  And this case does not involve "the government's selective presentation of entirely truthful evidence [that] can cast a defendant in an inaccurate, unfavorable light," so as to implicate the remaining *Hurn* circumstance. *See Hurn*, 368 F.3d at 1366–67.

Here, Parks has not shown that the district court violated his rights to put on a complete defense.  Parks indicates that he wished to call the detectives primarily to impeach Washington's trial testimony, but the detectives' testimony, as proffered by the government, is consistent with Washington's testimony.  The detectives' testimony reflects that Washington did not say that he had possessed the Desert Eagle firearm during the robbery, that the two detectives who interviewed Washington (Gonzalez and Acosta) did not tell Peart that Washington did, and that no one else told Peart as much, and Parks acquiesced in not requiring Gonzalez and Acosta to testify if they stated that they had not told Peart that Washington possessed the Desert Eagle firearm during the robbery.  So, the most this testimony would have established was that Peart made an error in drafting the affidavit in support of the criminal complaint.  As the court pointed out, however, the affidavit was not in evidence and Peart had not testified.

In these circumstances, the district court properly excluded the detectives' testimony.[5]  Parks did not object to the government's proffer, and he offers no

---

[5] We reject Parks's assertion that the district court's decision was based on

reason to believe that the detectives' testimony would have been different than proffered or that he could have elicited additional, admissible information.  Thus, on the whole, Parks has presented no plausible or clear basis for concluding that the excluded evidence would have had a "substantial," or any, impact on Washington's credibility.  *See Hurn*, 368 F.3d at 1366.

Moreover, it is not clear that any of the testimony Parks sought to elicit would even have been admissible.  *See Frazier*, 387 F.3d at 1271 (stating that a defendant has no right to introduce inadmissible evidence).  When Parks attempted to ask Gonzalez on cross-examination about Washington's post-arrest statements, the district court sustained the government's objections on hearsay grounds.  Parks does not suggest error in that ruling or otherwise address the court's concerns, demonstrated in the colloquies reproduced above, about the admissibility of the testimony Parks sought to elicit, all of which broadly related to what the detectives were told by others persons.

To the extent Parks argues that the dispute about Washington's testimony was relevant to the credibility of "the detectives involved in Mr. Parks' so-called confessions," the relationship between the excluded testimony and these other witnesses' credibility, or even his own credibility, "is simply too long, dubious, or

inconveniencing the detectives, even if time constraints factored into the court's decision to suggest that the government "speak to these individuals as they're getting dressed and traveling here, so that if we can abort their transportation here after discussing it, we can do so."  We note that Parks "ha[d] no objection" to the court's suggestion.

14

attenuated to require that the evidence be introduced." *See Hurn*, 368 F.3d at 1366. At trial, Parks did not deny committing the Check Cashing Store robbery, the only one involving Washington, even if he denied carrying a firearm during it. Rather, Parks testified that he did not commit, and was coerced into confessing to, the robberies at Sunoco, M&M, and McDonald's. But Mohammed, the detective who testified about Parks's confessions to these robberies, has no apparent connection to the Desert Eagle controversy. Accordingly, it is purely speculative for Parks to claim that the excluded testimony somehow could have been used to impeach Mohammed or, for that matter, any of the government's eye witnesses.

Parks also asserts that he wanted to call Detective Peart to impeach other detectives' testimony "regarding the confessions and what transpired at the interviews that led to them" and to corroborate Park's own testimony. However, while a defendant generally does not have to state in advance what a potential defense witness will testify about, the discussion at trial was limited to Peart's potential testimony about the affidavit. Parks never told the court that he wanted Peart to testify as to anything but the affidavit, nor did he attempt to call Peart as a witness after the court rejected that proposed testimony. The district court did not err, plainly or otherwise, by solely addressing Parks's stated request and failing to divine Parks's unspoken intentions.

Finally, Parks asserts throughout his briefing that the evidence supporting his convictions was weak or non-existent, that the investigation into the robberies was shoddy, that the eye-witness identifications were unduly suggestive, and that his confessions were coerced and part of an attempt to simply close cases on Parks after the Check Cashing Robbery. To the extent Parks addresses these issues for purposes of harmlessness review, we do not reach that issue because we conclude that Parks's constitutional rights were not violated. *See Hurn*, 368 F.3d at 1362–63. To the extent Parks intended to raise any of these issues as separate matters, he has not adequately briefed these issues on appeal, so we do not address them. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

In sum, Parks has not shown that the district court violated his constitutional rights to present a defense. We therefore affirm his convictions.

**AFFIRMED.**

16